UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **RODNEY KEISTER,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.: 7:17-cv-00131-RDP |
| } | |
| **STUART BELL, et al.,** } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION

### I.   Introduction

This matter is before the court on Plaintiff's Amended Motion for Preliminary Injunction (Doc. # 7).  The motion is fully briefed.  (Docs. # 10, 15, 17).  Plaintiff, a traveling evangelist, moves for a preliminary injunction to enjoin Defendants, University of Alabama ("UA") officials, from enforcing UA's "Grounds Use Policy" and permit scheme.  Specifically, Plaintiff desires to speak at the northeast corner of the intersection of University Boulevard and Hackberry Lane, and he contends that UA's Policy unlawfully infringes on his First Amendment right to do so at that location.  Defendants contend that the specific sidewalk involved in this dispute is not a traditional public forum, and in turn, UA's Policy does not infringe on Plaintiff's First Amendment rights.

### II.   Relevant Undisputed Facts

Plaintiff is a travelling Christian missionary, who shares his religious beliefs in public places across the country.  (Doc. # 1 at ¶¶ 12-14).  He typically conveys his message[1] on public sidewalks, and he frequently visits college campuses to share his beliefs.  (Doc. # 1 at ¶¶ 15, 16).

---

[1] Plaintiff tries to convince people of the merits of Christianity by: handing out religious literature ("gospel tracts"), engaging people in one-on-one conversation and prayer, and preaching his beliefs to those nearby.  (Doc. #

On March 10, 2016, Plaintiff's travels took him to the University of Alabama, a state-funded public university located in Tuscaloosa, Alabama. (Docs. # 6-1 at ¶¶ 19-21, # 15 at ¶ 5). At around 4:00 p.m., Plaintiff -- who is not a UA student, employee, or faculty member -- began sharing his religious beliefs on UA's campus. (Doc. # 6-1 at ¶¶19-23). Plaintiff, as well as a companion of his, began spreading their message[2] on a sidewalk next to 6th Avenue, near the corners of Smith Hall and Lloyd Hall on UA's campus. (*Id.*; Doc. # 15 ¶¶ 41-43). Shortly after Plaintiff and his companion began, they were approached by campus police and a UA representative, who informed the pair that they could not continue their activities because UA policy required that they obtain a grounds use permit before engaging in such expressive conduct. (Doc. # 6-1 at ¶¶ 33-35; Doc. # 15 at ¶ 44).

Because Plaintiff did not have a grounds use permit, he moved to the sidewalk at the intersection of University Boulevard and Hackberry Lane ("the intersection") to continue handing out gospel tracts and preaching. (Doc. # 6-1 at ¶ 42, 44-45). Plaintiff contends that he picked this spot because he believed that it was a public city sidewalk, as opposed to university owned property (where UA's grounds use policy applied). (Doc. # 6-1 at ¶ 42). Plaintiff further contends that, while speaking with a UA police supervisor on 6th Avenue, Plaintiff specifically proposed that he move locations and preach at the University Boulevard and Hackberry Lane intersection. (Doc. # 6-1 at ¶ 36-37). He asserts that UA police specifically told him: "On that corner, you're good." (*Id.* at ¶ 41).

A short while after moving to the intersection sidewalk, UA campus police again approached Plaintiff and informed him that the intersection (and sidewalk) were indeed part of

---

6-1 at ¶¶ 10-12, 17). He contends that these methods do not draw crowds or otherwise impede pedestrian traffic. (Doc. # 6-1 at ¶¶ 13-14).

[2] Plaintiff held a banner and passed out literature to students, while his companion orally preached to students passing by. (Doc. # 6-1 at ¶ 24; Doc. # 15 at ¶¶ 41-43).

campus, and UA's ground use applied at that physical location. Fearing arrest for criminal trespass, Plaintiff left UA's campus and has not returned to the intersection sidewalk since March 10, 2016. (Doc. # 6-1 at ¶¶ 51-52). However, Plaintiff states that he plans to go back to Tuscaloosa and would like to return to the particular intersection sidewalk to preach when he returns. (*Id.* at ¶ 57).

### A.     The Intersection Sidewalk

The intersection of University Boulevard and Hackberry Lane, where Plaintiff sought to preach and hand out gospel tracts, is located in the heart of UA's campus. (Doc. # 15 at ¶ 34). However, while they intersect on campus property (and run through much of UA's campus), both University Boulevard and Hackberry Lane are city streets that run beyond the perimeter of UA's campus.[3] (Doc. # 6-5). Sidewalks abound both University Avenue and Hackberry Lane. (Doc. # 1 at ¶ 37).

The sidewalks at the intersection, however, are maintained by the University.[4] Russell Hall, a university owned building, sits on the northeast corner of the intersection (the particular corner where Plaintiff did his preaching). (Doc. # 1 at ¶ 60; Doc. # 15 at ¶ 35). On the northwest corner of the intersection is a campus parking lot with a sign restricting its use to university faculty and staff. (Doc. # 15 at ¶ 36). The intersection is further surrounded (on three sides) with other identifiable university buildings, including Gallalee Hall and Farrah Hall. (*Id.* at ¶ 35). However, on one side of University Boulevard (approximately one city block away from the intersection) there are certain private businesses "mixed in" with the university buildings. (Doc. # 17-1 at ¶¶ 7-8).

---

[3] Indeed, UA's campus is not fenced off, gated, or otherwise self-contained, and while it is its own separate property, some of the city's transportation grid runs through the campus. (Doc. # 1 at ¶ 30-31).

[4] This fact was admitted by the parties at oral argument.

There are streetlamps at the intersection. (Doc. # 15 at ¶ 39). University of Alabama signs hang from these streetlamps. (*Id.*). Along with the respective street names, the street signs at the intersection display the script "A" logo of the university. (*Id.* at ¶ 37). Landscaping fences, which run through campus, are on each corner of the intersection. (*Id.* at ¶ 38).

### B.     The Speech Policy

UA's Policy governs when, where, and how persons not affiliated with the university may engage in public speaking on campus. (*Id.* at ¶ 12). The Policy specifically provides for the use of UA sidewalks. (*Id.* at ¶ 18; Doc. # 15-2 at p. 2). The Policy provides that persons not affiliated with UA who wish to conduct an event or engage in public speaking must: (1) be sponsored by or affiliated with a University academic or administrative department or registered student organization; and (2) complete a Grounds Use Permit ("GUP") form. (Doc. # 15-2 at pp. 2, 4). The Policy requires that applicants request permission ten (10) working days prior to the event "[t]o facilitate the review by all the different University departments that have responsibility for the various aspects of an Event." (*Id.* at p. 4). The Policy provides that, "[i]f an Event does not involve factors that require multiple University department approvals, approval may be given in as few as three (3) days, if the GUP form is filled out completely and accurately." (*Id.*). The university will approve of an application properly made under the Policy unless there are reasonable grounds to believe that one or more of the conditions listed under Section G(1) of the Policy are present.[5] (Doc. # 15 at ¶ 26). Further, applicants may appeal a GUP denial as provided by Section H of the Policy.

---

[5] Specifically, the Policy states that the university will approve the application, unless there are reasonable grounds to believe that one or more of the following conditions are present: 1) the applicant, if a student or a recognized student organization, is under a disciplinary penalty withdrawing or restricting privileges made available to the student or a recognized student organization, such as use of a facility; 2) the proposed location is unavailable at the time requested because of events previously planned for that location; 3) the proposed date or time is unreasonable given the nature of the event and the impact it would have on University resources; 4) the event would unreasonably obstruct pedestrian or vehicular traffic; 5) the event would prevent, obstruct, or unreasonably interfere

**III.    Analysis**

The purpose of the preliminary injunction is to preserve the positions of the parties as best as possible until a trial on the merits may be had. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It is axiomatic that entry of a preliminary injunction in advance of trial is an extraordinary and drastic remedy not to be granted unless the movant "clearly carries the burden of persuasion" as to the four prerequisites. *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal citations omitted). A district court may grant injunctive relief if the movant shows:

> (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) that if issued the injunction would not be adverse to the public interest.

*All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989).

Plaintiff brought this action pursuant to 42 U.S.C. §§ 1983 and 1988 and alleges that UA's speech policy unduly restricts religious expression, "including literature distribution and conversational dialogue, taking place on… sidewalks and ways." (Doc. # 1 at ¶ 1). His motion for preliminary injunction specifically requests that the court enjoin Defendants from enforcing UA's speech policy in the space where Plaintiff desires to speak (*i.e.*, the sidewalks adjoining University Boulevard and Hackberry Lane). (Doc. # 10 at pp. 4, 11).

---

with the regular academic, administrative, or student activities of, or other approved activities at, the university; 6) the event would constitute an immediate and actual danger to University students, faculty, or staff, or to the peace or security of the University that available law enforcement officials could not control with reasonable effort; or, 7) the university affiliate on whose behalf the application is made has on prior occasions a) damaged university property and has not paid in full for such damage, or b) failed to provide the designated university official with notice of cancellation of a proposed activity or event at least two university working days prior to a scheduled activity or Event. (Doc. # 15-2 at p. 5).

Oral and written dissemination of religious views and doctrines is protected by the First Amendment. *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Accordingly, both religiously motivated speech and the distribution of handbills are entitled to constitutional protection. *Id.*; *Fla Gulf Coast Bldg. & Const. Trades v. NLRB*, 796 F.2d 1328, 1332 (11th Cir. 1986); *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 108 (1943).

But, the First Amendment does not guarantee access to property just because it is owned by the government. *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985)). Instead, in determining whether a forum is open to public expression (or whether a prior restraint on expression is permissible) the court is required to do two things. First, a court must "examine the policy and practice of the government to determine whether it intended to open a specific place for public discourse."[6] *Bloedorn*, 631 F.3d at 1230, citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Second, if the government's intent is not to open a specific place for public discourse (or, alternatively, to open that place to only a limited class), the court must engage in a forum analysis. *United States v. Frandsen*, 212 F.3d 1231, 1236-37 (11th Cir. 2000). This is because, "[i]n order to help answer whether government property may be utilized for an expressive purpose by the general public, the courts have resorted to classifying the character of the property." *Bloedorn*, 631 F.3d at 1230. Accordingly, "[w]hen a regulation restricts the use of government property as a forum for expression, an initial step in analyzing whether the regulation is unconstitutional is determining the nature of the government property involved." *Id.* at 1237 (citing *United States v. Kokinda*, 497 U.S. 720, 726–27 (1990)).

---

[6] The court notes that, while the historical use of the forum is relevant in conducting a forum analysis, there is no record evidence regarding how long UA has employed its speech policy or its historical practice regarding the intersection sidewalk. But, without question, UA's position here is that it has not opened the sidewalk at issue to public discourse.

The Eleventh Circuit, interpreting Supreme Court pronouncements, has identified four different categories of forums: traditional public, designated public, limited public, and nonpublic. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 871 (11th Cir. 2011); *Bloedorn*, 631 F.3d at 1232. Importantly, the degree of scrutiny placed on a government's restraint of speech is determined by the nature of the forum the government seeks to regulate. Here, Plaintiff contends that the sidewalk at issue is a traditional public forum. (Doc. # 10 at p. 11). Defendant argues that the sidewalk is a limited public forum. (Doc. # 14 at p. 8).

In *Bloedorn*, our circuit court described the distinction between these two categories of forums:

> Traditional public fora are public areas such as streets and parks that, since "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Thus, a time, place, and manner restriction can be placed on a traditional public forum only if it is content neutral, narrowly tailored to achieve a significant government interest, and "leave[s] open ample alternative channels of communication."

631 F.3d at 1231. By contrast:

> [A] limited public forum may be established when the government limits its property "to use by certain groups or dedicate[s it] solely to the discussion of certain subjects." Any restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral.

*Id.* Accordingly, the threshold question is whether the sidewalk is a traditional or limited public forum.

### A. The Forum Analysis Framework

Public sidewalks have long been considered a "prototypical example" of a traditional public forum. *Schenck v. Pro-Choice Network Of W. N.Y.*, 519 U.S. 357, 358 (1997). Indeed, "without more," public places such as sidewalks are considered to be traditional public forums. *United States v. Grace*, 461 U.S. 171, 177 (1983). Of course, there is "more" in this instance.

Plaintiff desires to speak on a university sidewalk, as opposed to a public city sidewalk. However, ownership or control of a sidewalk alone is not dispositive to the forum analysis, and instead, "[t]raditional public fora are defined by the objective characteristics of the property." *Ark. Educ. Television Comm'n*, 523 U.S. at 677; *see also Grace*, 461 U.S. at 177.

Further, while a state-funded university's campus is not a traditional public forum, the court cannot consider UA's campus as a whole in conducting its analysis. *Bloedorn*, 631 F.3d at 1232. Instead, the scope of the relevant forum (*i.e.*, the university campus) is defined by the "access sought by the speaker," meaning that when a speaker seeks access to only a limited area of government property, forum analysis must be tailored to that limited area. *Id.* (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985)).[7] Two important conclusions follow. First, in considering Plaintiff's motion for preliminary injunction, the court is constrained to determining only whether the specific area Plaintiff seeks to speak is a traditional public forum. Second, in determining the nature of the forum, the court's analysis must assess the objective characteristics of the property. Indeed, Plaintiff has directed the court to cases in which federal courts, after examining the objective characteristics of the sidewalks, have pegged university sidewalks that appear like, and blend in with, surrounding municipal sidewalks and the urban grid, to be traditional public forums. *See McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012); *Brister v. Faulkner*, 214 F.3d 675, 681-82 (5th Cir. 2000).

However, *Bloedorn* appears to add another wrinkle to this analysis. 631 F.3d at 1233. While the court examined the objective physical characteristics of the forum, it nonetheless determined that "[t]he physical characteristics of the property alone cannot dictate the forum

---

[7] Starting with this premise, the *Bloedorn* court reasoned that "[a] university campus will surely contain a wide variety of fora on its grounds," and cited *Bowman v. White*, 444 F.3d 967, 976–77 (8th Cir.2006) for the premise that "labeling the campus as one single type of forum is an impossible, futile task." 631 F.3d at 1232.

analysis. *Id.* (citing *Kokinda*, 497 U.S. at 727). The court reasoned that, "[i]nstead, we look to the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics."[8] *Id.* (citing *Greer v. Spock*, 424 U.S. 828, 837-38 (1976); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)). Accordingly, when courts in this circuit conduct a forum analysis, they are tasked with assessing the forum's physical characteristics, as well as the traditional uses made of the property. To be sure, this is a fact-intensive inquiry, and at least some courts have been guided by the time-tested adage: "[i]f it looks like a duck, and it walks like a duck, and it quacks like a duck, then it's probably a duck." *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1080 (N.D. Fla. 2016) (noting the utility of the "duck test" in the context of forum analysis). So, the question becomes this: is the intersection a public forum duck or a limited public forum duck?

### B. The Intersection Sidewalk is a Limited Public Forum

The parties each direct the court to cases which they contend involve similar factual scenarios to the present case. Plaintiff points to *McGlone*, where the Sixth Circuit held that perimeter sidewalks along the side of Tennessee Tech's ("TTU") campus were traditional public forums. 681 F.3d at 732-33. The court reasoned that the perimeter sidewalks were traditional public forums "[b]ecause the perimeter sidewalks at TTU blend into the urban grid and are physically indistinguishable from nearby city sidewalks." *Id.* at 733. Similarly, the Fifth Circuit

---

[8] This approach is consistent with the Eighth Circuit's reasoning in *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006). There, the plaintiff sought "to speak at various locations throughout the campus including the streets, sidewalks, and open areas located inside and directly adjacent to the campus." *Id.* at 977. The record evidence demonstrated that those particular areas "combine[d] the physical characteristics of streets, sidewalks, and parks, and are open for public passage." *Id.* The court reasoned, however, that the open nature of those spaces was merely one factor in determining whether the government had opened its property. *Id.* at 978. In determining that the particular forums were not traditional public forums, the court noted that "streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus." *Id.* As such, the court conducted its analysis by looking to the "university's purpose, its traditional use, and the government's intent with respect to the property," and reasoned that "a university's mission is education and the search for knowledge – to serve as a special enclave devoted to higher education." *Id.* (internal citations omitted).

9

held that the sidewalks outside a University of Texas property, which was surrounded on all sides by public streets, were a traditional public forum, where there was no physical demarcation indicating where university property ended and the city's began. *Brister v. Faulkner*, 214 F.3d 675, 682 (5th Cir. 2000).

Plaintiff further points to *U.S. v. Grace*, 461 U.S. 171 (1983). In *Grace*, the Supreme Court determined that the sidewalks running along the outer boundaries of the Supreme Court's grounds were traditional public forums. *Id.* at 179-80. The court reasoned that, "[t]he sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington D.C., and we can discern no reason why they should be treated any differently." *Id.* at 179. The court found it instructive that, "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180.

By contrast, Defendants rely heavily on *Bloedorn* in support of their position. There, the Eleventh Circuit determined that the sidewalks of Georgia Southern University ("GSU") were not traditional public forums. 631 F.3d at 1233-34. The court initially reasoned that:

> Even though GSU's campus possesses many of the characteristics of a public forum—including open sidewalks, streets, and pedestrian malls—it differs in many important ways from public streets or parks. Perhaps most important, the purpose of a university is strikingly different from that of a public park. Its essential function is not to provide a forum for general public expression and assembly; rather, the university campus is an enclave created for the pursuit of higher learning by its admitted and registered students and by its faculty.

*Id.* The court then assessed the physical characteristics of GSU's sidewalks, and determined that they were distinguishable from other public sidewalks because they were contained inside of GSU's campus, all of the University's entrances were identified with large blue signs and brick

pillars, all of the buildings were identified with large blue signs, and all of its parking lots had signs restricting their use to GSU community members. *Id.* at 1234.

Unlike the sidewalks in the cases cited by Plaintiff, the intersection sidewalks lie in the heart of UA's campus, and do not border the perimeter of the University's property. In that sense, the intersection sidewalks differ from those addressed in *McGlone*, *Brister*, and *Grace*, which were situated on the perimeter of the government properties in question. However, while the UA sidewalks may intersect on University property, they nonetheless border otherwise public streets which are a part of the city of Tuscaloosa's greater urban grid. The Supreme Court, in *United States v. Kokinda*, held that a postal sidewalk, which ran between a parking lot and the post office, was not a traditional public forum. 497 U.S. 720, 727-28, 730 (1990). The sidewalks at issue, however, are distinguishable from the sidewalk in *Kokinda* in at least one respect – they run parallel to public streets which extend beyond the reaches of UA's campus.[9]

As such, the court looks to the physical characteristics and visual surroundings of the intersection sidewalks to determine if they constitute an "enclave" distinguishable from the city streets and sidewalks outside of the campus' reach. Much like in *Bloedorn*, the physical characteristics of the intersection sidewalk (and its immediate surroundings) are what bear significantly on the forum analysis. University of Alabama signs hang from the streetlamps surrounding the intersection. And, those street signs display the script "A" logo of the university, and landscaping fences, which run through campus, are on each corner of the intersection. Plaintiff argues that these physical characteristics fall short of establishing the intersection sidewalks as a special sort of enclave removed from traditional forum status. (Doc. # 17 at p. 6); *see United States v. Marcavage*, 609 F.3d 264, 276 (3d Cir. 2010) (finding that a

---

[9] Indeed, the analysis in this case would be different if the sidewalks in question ran only from one UA building to another. However, while the sidewalks at issue do not run the whole length of each street, they do run parallel to University Boulevard and Hackberry Lane – two streets that pass through and beyond UA's campus.

11

sidewalk was not a "special enclave" despite being made of a different type of building block, and bordered by chain-linked metal bollards, because it was used as a public thoroughfare and connected to city sidewalks). The court disagrees.

Here, the physical characteristics of the intersection, viewed in conjunction with the intersection's surroundings, distinguish the intersection sidewalks from typical Tuscaloosa city sidewalks. Not only are aspects of the intersection embellished by UA markings, but the intersection itself is surrounded by UA's campus and buildings. Russell Hall, a clearly marked UA building, sits prominently at the corner where Plaintiff seeks to speak. On other sides, the intersection is bounded by distinctively marked campus buildings and a campus parking lot with a sign restricting its use to University faculty and staff. The intersection is surrounded by clearly identifiable UA property and has identifiable physical features which distinguish it from a typical city intersection. These objective characteristics, taken as a whole, demonstrate that the intersection sidewalk is not a traditional public forum. Instead, because UA -- through its permit policy -- limits access to its sidewalks to certain groups (*i.e.*, sponsored speakers), the sidewalk is a limited public forum. *See Bloedorn*, 631 F.3d at 1231.

The court arrives at this decision having viewed only the objective characteristics of the intersection sidewalk and its immediate surroundings. However, the court's analysis in *Bloedorn* further enforces this determination. As mentioned above, in conducting its forum analysis, the court found the purpose and essential function of a university to be different from that of a public park, and reasoned that this supported a finding that a university campus is a special enclave that is not a traditional public forum. 631 F.3d at 1233-34. To be sure, this holds true here. The essential function of the University of Alabama is not to provide a forum for general public expression. *See id.*; *Bowman*, 444 F.3d at 978. Rather, the campus functions as a sort of special

12

enclave "created for the pursuit of higher learning by its admitted and registered students and by its faculty." *Bloedorn*, 631 F.3d at 1234. That UA opens its campus to a limited group of sponsored individuals does not change the purpose of the university.

### IV.    Plaintiff has Failed to Establish the Four Factors Necessary to Grant Injunctive Relief

In deciding Plaintiff's Motion for Preliminary Injunction, the first prong of the analysis -- whether Plaintiff has a substantial likelihood of success -- proves to be the most important. In his Complaint, Plaintiff asserts causes of action for violations of the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. (Doc. # 1 at pp. 13-14). Because the intersection sidewalk is a limited public forum, the constitutionality of the speech policy, and Plaintiff's likelihood of success in bringing his First Amendment claim, turn on whether its restrictions on speech are reasonable and viewpoint neutral. *Id.* at 1231. The *Bloedorn* court found GSU's speech policy, which banned all non-sponsored speakers from speaking on the campus, reasonable. *Id.* at 1235. The court reasoned that GSU had an interest in preserving its limited facilities and resources for its students, faculty, and employees, and its speech policy reasonably advanced that aim while still permitting outside speech. *Id.* The same can surely be said here. UA's policy is also reasonable because it does not limit outside speakers' access to the campus entirely. Instead, it allows sponsored speakers access to UA's campus so long as the seven objective criteria listed in its policy are met.

Further, the *Bloedorn* court did not find the sponsorship requirement an unreasonable restraint on speech. *Id.* Consistent with that binding decision, neither does this court. Such a requirement furthers the university's aims as an educational institution and still allows individuals not associated with the university access to UA's grounds. Finally, the requirement that a hopeful speaker give UA a ten-day advance notice does not place an unreasonable prior

restraint on speech. (And, to be clear, in the instance of a limited public forum, that is all that is required – reasonableness. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010)). In *Bloedorn*, the court found that a similar, albeit shorter, notice requirement was not just reasonable, but "narrowly tailored." *Id.* at 1240. Notice requirements serve a legitimate purpose, particularly on a college campus. Universities are less equipped than other public forums to respond to disruptions on short notice, and implementing a relatively short[10] "wait period" for UA to review a GUP form is certainly reasonable. *See Sonnier v. Crain*, 613 F.3d 436, 445 (5th Cir. 2010), *opinion withdrawn in part on reh'g*, 634 F.3d 778 (5th Cir. 2011) (finding that a public university's speech policy was narrowly tailored when it employed a seven-day notice requirement).[11]

Further, as in *Bloedorn*, there is no indication that the ban on outside, non-sponsored speakers is viewpoint-based. *See* 631 F.3d at 1240. On its face, UA's speech policy applies equally to all outside, non-sponsored speakers. Similarly, there is no record evidence (nor has Plaintiff even alleged) that UA employs its speech policy in a viewpoint specific manner.[12]

---

[10] While the Policy requires that applicants request permission to speak ten (10) working days prior to the event, the Policy also provides that, "[i]f an Event does not involve factors that require multiple University department approvals, approval may be given in as few as three (3) days, if the GUP form is filled out completely and accurately." (Doc. # 15-2 at p. 4).

[11] Although the Fifth Circuit withdrew its *Sonnier* opinion in part, the court finds the reasoning of the opinion persuasive.

[12] Plaintiff maintained at oral argument that the sponsorship requirement embedded in UA's speech policy may ultimately lead to speakers being denied access to UA's campus based on their viewpoint. Speakers are only entitled access to the campus under UA's Policy if they are sponsored by a student group. Because there is a potential that student groups may deny him (or any other speaker) sponsorship based on his viewpoint, Plaintiff contends that UA's Policy itself is not viewpoint-neutral. The court disagrees and finds guidance from *Bloedorn* on this issue. There, regarding GSU's sidewalks, the court noted "[t]he University has limited these areas only for use by a discrete group of people – the GSU community; its students, faculty, and employees; and their sponsored guests. *Bloedorn*, 631 F.3d at 1232. Having found that Bloedorn was not "a member of the class of speakers for whose especial benefit the forum was created," the court reasoned that "he may be constitutionally restricted from undertaking expressive conduct on the University's sidewalks," and that such restriction (based on his lack of sponsorship) was not viewpoint-based. *Id.* at 1235. The court finds the same to be true here. UA's Policy applies equally to all sponsored speakers (who are allowed to speak so long as they meet the criteria outlined in the policy) and to all non-sponsored speakers (who are not allowed to speak, regardless of viewpoint). The key is that UA is

Instead, a review of the conditions UA imposes on sponsored speakers' access to facilities indicates that those conditions are in no way viewpoint-based. (*See* Doc. # 15-2 at p. 5 (prohibiting access to campus where the proposed location is unavailable, the event would unreasonably obstruct traffic, etc.)). Accordingly, the restrictions UA's speech policy places on speech are both reasonable and viewpoint neutral.

Further, while Plaintiff includes a Due Process based claim in his Complaint, and that claim alleges that UA's policies are vague and lack sufficient objective standards, he (1) makes no such argument in support of his Motion for Preliminary Injunction, and, in any event, (2) has not provided evidence on the matter. By contrast, Defendants have provided evidence of UA's speech policy, which establishes articulable and objective standards for reviewing speech requests. On the limited record, the court cannot conclude that Plaintiff has demonstrated a substantial likelihood of success on his Due Process claim. As such, Plaintiff has failed to demonstrate a substantial likelihood of success on the merits on either of the causes of action which form the basis of his Complaint.

## IV. Conclusion

On this limited record, the court finds Plaintiff has not established a substantial likelihood that he will succeed on his claim. Plaintiff's Motion for Preliminary Injunction is due to be, denied. A separate order will be entered.

---

not making any decisions based on a speaker's viewpoint. *See Gilles v. Miller*, 501 F. Supp. 2d 939, 948 (W.D. Ky. 2007) (finding that a university's sponsorship policy did not result in viewpoint discrimination where the university did not bar the plaintiff from obtaining a sponsorship from a student organization and did not forbid student groups with views similar to the plaintiff's).

**DONE** and **ORDERED** this March 6, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE