FILED

2019 Oct-10  PM 05:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **RODNEY KEISTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:** 7:17-cv-00131-RDP |
| | ) | |
| **STUART BELL, in his official capacity as** | ) | |
| **President of the University of Alabama,** | ) | **PLAINTIFF'S BRIEF IN SUPPORT OF** |
| **JOHN HOOKS, in his official capacity as** | ) | **MOTION FOR SUMMARY JUDGMENT** |
| **Chief of Police for the University of** | ) | |
| **Alabama Police Department, and MITCH** | ) | |
| **ODOM, individually and in his official** | ) | |
| **capacity as Police Lieutenant for the** | ) | |
| **University of Alabama Police Department,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

RELEVANT PROCEDURAL HISTORY AND NEWLY OBTAINED INFORMATION .......... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 3

ARGUMENT .......................................................................................................... 15

I.   UA'S POLICY AND ENFORCEMENT AGAINST KEISTER'S SPEECH ON CITY-
     OWNED SIDEWALKS ARE UNCONSTITUTIONAL ....................................... 15

     A.  Keister's Speech is Constitutionally Protected .............................................. 16

     B.  Sidewalks at the Intersection of University Blvd. and Hackberry Lane are Traditional
         Public Fora ................................................................................................. 16

         1.  Sidewalks are City-Owned and Traditional Public Fora as a Matter of Law ............ 17

         2.  Objective Function and Appearance of Sidewalks Confirm Traditional Public
             Fora Status .......................................................................................... 19

     C.  UA's Permitting Restrictions are Unconstitutional ........................................ 21

         1.  UA's Grounds Use Policy is Unconstitutional in Traditional Public Fora ................ 22

             a.  Restricting Speech Whose Content is Not Deemed "Casual Recreational or
                 Social Activities" is Unconstitutionally Vague .................................... 22

             b.  Restricting Speech Whose Content is Not Deemed "Casual Recreational or
                 Social Activities" is Content-Based ................................................... 23

             c.  Sponsorship Requirement Vests Unbridled Discretion for Licensing Speech ..... 24

             d.  Permit Requirement and Associated Burdens on Individual and Small Group
                 Expression are Not Narrowly Tailored ............................................... 25

             e.  Grounds Use Policy Does Not Leave Open Ample Alternatives ........................ 27

         2.  Regardless of Forum Classification, a 10-Working-Day Advance Notice
             Requirement is Unconstitutional .......................................................... 28

II.  KEISTER IS ENTITLED TO HIS REQUESTED RELIEF .................................. 29

CONCLUSION ...................................................................................................... 30

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56, Plaintiff Rodney Keister ("Keister") moves the Court for summary judgment in this action challenging the constitutionality of Defendants' (jointly "UA") grounds use policy that severely restricts Keister's religious speech on city-owned public sidewalks.  Absent disputed material facts, the issues before the Court are purely legal in nature, and Keister is entitled to judgment as a matter of law.

The Court, based on the limited record before it, previously denied Keister's Motion for Preliminary Injunction, which decision was affirmed by the U.S. Court of Appeals for the Eleventh Circuit.  This Court and the appellate court concluded that Keister was not likely to prevail on the merits due to the belief that the sidewalks where Keister wants to speak are university sidewalks located in the "heart" of UA's campus and thus classify as limited public fora where speech restrictions are more appropriate.  But information gleaned in discovery disallows this premise.

Discovery reveals that these sidewalks are owned by the City of Tuscaloosa, not UA, and sit outside the bounds of UA campus.  As such, they are traditional public fora as a matter of law. Discovered information also confirms that these sidewalks look and function like the public venues they are, supplying an independent reason for pegging them traditional public fora.  It follows that a permit process making a speaker find a sponsor and supply 10-working-day advance notice to speak cannot withstand constitutional scrutiny in traditional public fora. Indeed, even if the fora were deemed nonpublic, UA's burdensome requirements are not constitutionally sustainable.

**RELEVANT PROCEDURAL HISTORY AND NEWLY OBTAINED INFORMATION**

On January 25, 2017, Keister filed his initial complaint, challenging UA's policy and its application that effectively banned his speech on sidewalks located at the intersection of University Blvd. and Hackberry Lane from March 10, 2016 forward.  (*See* Doc. 1 [Verified Complaint]).  The complaint sought injunctive and declaratory relief on UA's ongoing policy, as well as nominal

damages for the violation of constitutional rights.  (Doc. 1, pp. 14-15).  Keister also filed Motion for Preliminary Injunction, pursuing relief from the unconstitutional policy as soon as practicable. (*See* Doc. 6 [Motion for Preliminary Injunction]).

UA has staunchly defended the policy, arguing the sidewalks are limited public fora.  (*See* Doc. 16 [Response to MPI]).  Relying on a UA campus map showing campus buildings and intersecting streets, among other parts of Tuscaloosa, UA contended that the sidewalks are in the "heart" of campus and not on the perimeter of it.  (Doc. 16, p. 9; Ex. 8).  This Court accepted the "heart" premise and found the physical indicia of the surroundings insufficient to counter this perception, concluding that the sidewalks are limited public fora and the policy reasonable and viewpoint neutral.  (Doc. 22 [Opinion Denying MPI], pp. 11-15).  On appeal, the Eleventh Circuit similarly believed the sidewalks are UA property found in the "heart" of campus, holding the sidewalks limited public fora based on the limited record before it.  *Keister v. Bell*, 879 F.3d 1282, 1291 (11th Cir. 2018).  The appellate court relied heavily on an allegation in the complaint that the sidewalks lie within the bounds of the UA campus.  *Id.* at 1289 n. 5.  The Eleventh Circuit did, however, express doubts about the reasonableness of the 10-working-day advance notice requirement and left open the prospect of a due process claim.  *Id.* at 1287-88 nn. 2 & 4.

After remand, Keister amended his complaint to clarify his claims, asserting that the intersection of University Blvd. and Hackberry Lane is *near* the UA campus, not on it, or within the bounds of it.  (*See* Verified Amended Complaint ["VAC", Doc. 39]).  Discovery followed, and newly found evidence exposes the corner sidewalks as city property, not UA property.  A written permit agreement between UA and City of Tuscaloosa shows the sidewalks lie on property owned and controlled by the City, reserved for public right-of-way and access. (Ex. 7, pp. 1-2; *see* Ex. 5). Exercising its control, the City grants UA a revocable license to construct and maintain

improvements like the sidewalk.  (Ex. 7, pp. 2-3).  The City does not grant UA authority to exclude the public therefrom, specifically reserving "pedestrian access."  (Ex. 7, p. 2).  City ownership and control of the property is further confirmed by a map from UA's Office of Construction Administration, which places the sidewalks beyond the boundaries of the UA campus.  (Ex. 5).

This fresh information sheds critical light on the legal issues, proving the sidewalks are not what the parties, this Court, and the Eleventh Circuit had previously assumed.  Contrary to the depiction as UA-owned property in the "heart of campus," the sidewalks are city-owned sidewalks lying outside the bounds of UA campus and subject to a pedestrian right of access and travel.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      UA is a large public university located in the City of Tuscaloosa.  (VAC, ¶ 29; Defendants' Answer to Verified Amended Complaint ["Answer", Doc. 54], ¶ 29).

2.      The UA campus is not a singular area with one set of specific boundaries but consists of numerous spaces located in different parts of the City of Tuscaloosa, blending into the transportation grid and infrastructure of the city.  (Ex. 5; Ex. 56, p. 66, ll. 18-20).

3.      Several public city-owned streets run alongside the various portions of the UA campus, including University Boulevard (Blvd.), Hackberry Lane, and Paul Bryant Drive (Dr.).  (VAC, ¶ 32; Answer, ¶ 32).

4.      University Blvd. is a city-owned public street that runs for over 10 miles through downtown Tuscaloosa, passing many private entities as well as portions of UA campus.  (VAC, ¶ 34; Answer, ¶ 34).  Hackberry Lane is another city-owned public street running through downtown Tuscaloosa.  It too passes by many private entities in addition to portions of UA campus.  (VAC, ¶ 35; Answer, ¶ 35).

5.      University Blvd. and Hackberry Lane intersect near UA campus.  (VAC, ¶ 36; Answer, ¶ 36; Ex. 5).  The northwest and southwest corners of this intersection border UA parking

lots.  (VAC, ¶ 39; Answer, ¶ 39; Ex. 2).  The southeast corner of this intersection is next to a small park-like area, connected to Canterbury Chapel Episcopal Church that sits immediately to the south of it.  (VAC, ¶ 39; Answer, ¶ 39; Ex. 2; Ex. 4).  And the northeastern corner sits in front of a lawn area with Russell Hall, a UA administrative building, sitting back from the intersection. (VAC, ¶ 39; Answer, ¶ 39; Ex. 3).

6.      No portion of University Blvd. falls within the boundaries of UA campus.  (Ex. 5). The portion of Hackberry Lane starting at the intersection with University Blvd. and proceeding south does not fall within the boundaries of UA campus.  (Ex. 5).

7.      Public sidewalks run alongside University Blvd. and Hackberry Lane for much of their length, including at the intersection of the two city streets.  (VAC, ¶ 37; Answer, ¶ 37).

8.      The public sidewalks located at the northeast and southeast corners of the intersection of University Blvd. and Hackberry Lane, and to the east and south, are outside of UA campus boundaries.  (Ex. 5; Ex. 6).

9.      The City of Tuscaloosa owns the property where University Blvd. and Hackberry Lane intersect, and the bounding sidewalks lie, giving the city a municipal right-of-way over the streets and sidewalks at that intersection.  (Ex. 7, pp. 1-2; Ex. 5; Ex. 6).

10.      As owner of the property where the streets and sidewalks lie, and holder of municipal right-of-way, in 2017, the City of Tuscaloosa granted to UA a revocable, non-exclusive license to install and maintain sidewalks, decorative fencing, chains and bollards, and other infrastructure within the right of way on University Blvd. from Wallace Wade Ave. to Alberta Bridge, encompassing the sidewalks located at the intersection of University Blvd. and Hackberry Lane and this portion of University Blvd. itself (Ex. 7), which formalized a previous understanding. (Ex. 57, p. 86, l. 15 – p. 87, l. 7).

4

11.     Per the understanding, UA assumed responsibility for maintenance and repair of the right-of-way.  (Ex. 7, pp. 2-3).  The City retained ownership and control of the property, specifically reserving use and enjoyment of the right-of-way for pedestrian access. (Ex. 7, p. 2).

12.     The intersection corner sidewalks are up to 25 feet wide and allow for free, unhindered pedestrian access, with individuals unaffiliated with UA regularly making use of the sidewalks for travel to various locations in and outside of UA.  (VAC, ¶ 37; Answer, ¶ 37; Ex. 2; Ex. 3; Ex. 4).

13.     The city-owned sidewalks at the intersection connect to, and are indistinguishable from, other city-owned sidewalks found elsewhere in the City of Tuscaloosa, functioning and appearing like other city sidewalks.  (Exs. 2, 3, 4, 15, 23, 47, 48, and 50).

14.     The city-owned sidewalks at the intersection are made of concrete like other city sidewalks.  (Exs. 2, 3, 4, 15, 23, 47, 48, and 50).  The portions of University Blvd. and Hackberry Lane at the intersection are made of asphalt like other city streets.  (Exs. 2, 3, 4, 12, 15, and 45).

15.     The city-owned sidewalks at the intersection physically connect to the city-owned streets (University Blvd. and Hackberry Lane) and lie outside the decorative fencing nearby.  (Ex. 2; Ex. 3; Ex. 4).

16.     Within one block of the intersection, these sidewalks travel alongside privately-owned property, including the Baptist Ministry and PNC Bank to the east and an Episcopal Church to the south.  (Ex. 26; Ex. 50; Ex. 5).  Further east and south along these streets, the sidewalks run by other privately-owned properties as well as university-owned properties.  (Exs. 14-22; Exs. 36-48).

17.     Approaching the intersection from the south on Hackberry Lane, or from the east on University Blvd., there are no fences, pillars, gates, arches, signs, or any other identifiers marking entrance into the UA campus.  (Ex. 10; Exs. 11-51).

18.     Street signs above the intersection bear the city seal for the City of Tuscaloosa as well as UA's "A" symbol.  (Ex. 31; Ex. 32).

19.     UA has a Grounds Use Policy that regulates activities, including expressive activities.  (Ex. 52; Ex. 53).

20.     UA enforces the Grounds Use Policy on all property it owns, as well as city-owned property UA maintains and has assumed responsibility for repair.  (Ex. 57, p. 10, ll. 5-8, p. 15, l. 20 – p. 16, l. 7).  Among other spaces, UA enforces the Grounds Use Policy to expressive activities occurring on the city-owned sidewalks at the northeast and southeast corners of the intersection of University Blvd. and Hackberry Lane.  (VAC, ¶ 74; Answer, ¶ 74).

21.     By its express terms, the Grounds Use Policy considers any expressive activity an event requiring a permit unless it qualifies as "casual recreational or social activities."  (Ex. 53, p. 1).  The policy declares: "Other than uses for casual recreational or social activities, reservations must be made for the use of buildings and grounds under the control of the University, including University sidewalks (an 'Event')."  (Ex. 53, p. 1).

22.     The policy does not define what constitutes "casual recreational or social activities."  (Ex. 53).

23.     Specifically, literature distribution constitutes an "event" to which the policy and its restrictions apply.  (Ex. 53, p. 6; Ex. 57, p. 82, ll. 11-17).

24.     Under the Grounds Use Policy, if an individual unaffiliated with UA wishes to engage in expression in areas on UA's campus or property near campus that UA maintains, that

person must first secure a sponsorship from a registered student organization or UA faculty. (Ex. 53, p. 1; VAC, ¶ 78; Answer, ¶ 78). Individual students do not qualify and may not sponsor non-university speakers. (Ex. 57, p. 49, ll. 3-17). If a speaker cannot obtain a qualified sponsor, that speaker is prohibited from speaking on campus. (Ex. 57, p. 49, l. 18 – p. 50, l. 18).

25.     If a non-university speaker obtains a university-approved sponsor, the speaker must submit an event application to UA 10 working days in advance. (Ex. 53, p. 3; Ex. 54).

26.     The only exception for the 10-working-day advance notice requirement is if the speech "is occasioned by news or issues coming into public knowledge with the preceding two (2) calendar days." (Ex. 53, p. 3). In such circumstance, UA may grant a permit within 24 hours, but there is no guarantee it will do so. (Ex. 53, p. 3).

27.     Keister is a travelling evangelist for his Christian faith and regularly shares his religious viewpoints in public places throughout the country. (Ex. 1, ¶¶ 3-6).

28.     Though he considers where he wants to visit in advance, he does not know precisely where he will speak, when he will arrive, or how long he will stay, in advance. (Ex. 1, ¶ 7). Often, weather and other unforeseen circumstances alter his travel plans on short notice. (Ex. 1, ¶ 7).

29.     Keister typically shares his views on public sidewalks where he can reach as many people as possible. (VAC, ¶ 15; Answer, ¶ 15). Due to his sincere desire to reach college-aged individuals with his message, Keister also regularly visits public places close to college and university campuses. (Ex. 1, ¶ 9).

30.     Keister utilizes several means to share his religious beliefs. (Ex. 1, ¶¶ 10-12). He primarily passes out religious literature (called "gospel tracts") to people as they walk by. (Ex. 1, ¶ 10). He also engages others in consensual, one-on-one conversations and prayer, which adds a

personal touch to his communication.  (Ex. 1, ¶ 11).  Occasionally, Keister preaches with his natural voice, that is, publicly proclaims his beliefs to those within hearing distance.  (Ex. 1, ¶ 12).

31.     These methods draw attention of passersby to his message, but Keister's expression does not draw crowds, nor does he intend to draw crowds.  (Ex. 1, ¶ 13).

32.     Keister does not hinder pedestrian traffic on public ways, consciously allowing others to pass by him.  Keister does not solicit in any way.  (Ex. 1, ¶¶ 14-15).

33.     Keister shares his beliefs alone or with one or two friends.  (Ex. 1, ¶ 16).

34.     In his travels, Keister tries to get to Tuscaloosa, Alabama every year, and more than once a year, if he can, to share his religious viewpoints.  (Ex. 1, ¶ 18).

35.     Keister especially wants to share his faith on the public sidewalks bordering the intersection of University Blvd. and Hackberry Lane, particularly, on the northeastern and southeastern corners of the intersection.  (Ex. 1, ¶ 56).

36.     On March 10, 2016, at around 4:00 p.m., Keister went to Tuscaloosa to share his religious beliefs with UA students and others through literature distribution and oral speech.  (Ex. 1, ¶¶ 19-20).  On this day, Keister was accompanied by his friend Charles Edwards.  (Ex. 1, ¶ 20).

37.     Driving west toward UA campus on University Blvd., Keister saw some private businesses and some UA buildings, all the way up to and including the intersection with Hackberry Lane.  (Ex. 9, ¶¶ 4-11).  He did not notice any signs or other markers indicating a specific point where UA campus began, or anything indicating the sidewalks at the northeastern and southeastern corners of the intersection are controlled by UA.  (Ex. 9, ¶¶ 5, 9-12).

38.     After parking his car, Keister went with Edwards to a sidewalk bordering 6th Avenue on the UA campus where Keister handed out literature and Edwards orally preached.  (Ex. 1, ¶¶ 22-24).  Edwards briefly used an amplifier, but Keister did not.  (Ex. 58).

39.     Officer Babb with UA police department noticed the activity and informed dispatch of the presence of a "preacher" next to Lloyd Hall.  (Ex. 59).  Dispatch responded that UA administrative official Donna McCray would soon arrive to the scene.  (Ex. 59).

40.     Officer Babb, along with Officer Ellison, also of the UA police department, approached Keister and Edwards and asked them to cease their expression while they waited on McCray.  (Ex. 59).  Keister and Edwards complied with the directive.  (Ex. 58; Ex. 59).

41.     The officers informed Keister that he needed a permit to speak there and McCray would soon come and clarify UA's permit policy.  (Ex. 58; Ex. 59).

42.     The officers told Keister they had authority to arrest him and that if he refused to comply with UA's policy, they would arrest him for trespass.  (Ex. 58; Ex. 59).

43.     McCray eventually arrived and immediately asked Keister if he had a grounds use permit.  (Ex. 58; Ex. 59).  Keister responded in the negative, noting his understanding that he could not use amplification without one.  (Ex. 58; Ex. 59).  But McCray clarified the broader implications of the grounds use policy, explaining: "Well, to be on campus you have to have a permit for any outdoor activity on campus."  (Ex. 58; Ex. 59).

44.     Taken aback by the need for a permit for any outdoor activity, Keister asked whether he needed a permit just to exercise freedom of speech.  (Ex. 58; Ex. 59).  McCray replied, "yes sir," adding that he needs to submit a permit application 10 business days ahead of time and find a university entity willing to sponsor his speech.  (Ex. 58; Ex. 59).

45.     Keister asked what would happen if he refused to leave, and an officer confirmed that he would be issued a trespass warning, and if he refused to leave at that point, he would be arrested.  (Ex. 58; Ex. 59).

46.     As Keister was conversing with the officers about effects of a trespass, McCray called someone in authority on her cell phone, and excused herself.  (Ex. 58; Ex. 59).

47.     McCray returned, and while still on the phone, asked the police officers if they recalled the place where UA put Westboro Baptist Church on a prior occasion, a public right-of-way near Russell Hall, and whether Keister might be interested in it.  (Ex. 58; Ex. 59).  McCray then walked a short distance away again.  (Ex. 58; Ex. 59).

48.     Keister explained that, as a travelling evangelist, he could not comply with the advance notice and sponsorship requirements and his concerns about it.  (Ex. 58; Ex. 59).  The officers insisted that the grounds use policy applied to him.  (Ex. 58; Ex. 59).

49.     As this conversation was occurring, McCray stood approximately 20 feet away.  (Ex. 59).  She beckoned Officer Babb to come over to her and he did.  (Ex. 59).  McCray advised that her superiors wanted her to cease her involvement with Keister and let UA police department handle the situation.  (Ex. 59).  Officer Babb then called on his radio device for a police supervisor to come to the scene, and rejoined Officer Ellison and Keister.  (Ex. 59).

50.     Keister asked about another place where he could go that McCray mentioned and wanted to speak with her about that location.  (Ex. 58; Ex. 59).  The police officers apprised that they were handling the situation and a police supervisor was on the way.  (Ex. 58; Ex. 59).

51.     Keister asked if he could continue with his freedom of speech while they waited for a supervisor.  (Ex. 58; Ex. 60).  He specifically asked if he could hand out his pamphlets as they waited, but Officer Ellison said he could not because literature distribution was restricted by the grounds use policy.  (Ex. 58; Ex. 60).

52.     Lt. Mitch Odom, the supervisor in charge, walked up to the scene.  (Ex. 58; Ex. 60).  Upon arrival, Lt. Odom pulled Officer Babb aside and Babb apprised him that Keister wanted to

10

speak, but did not have a permit, and McCray had explained the permit requirement to him already. (Ex. 60).  Lt. Odom said he would try to get Keister to comply with the policy.  (Ex. 60).

53.     Lt. Odom approached Keister and introduced himself, and Keister informed of his desire to speak, asserting First Amendment rights.  (Ex. 58).  Lt. Odom then asked the other officers to give them a minute alone, and the officers walked a short distance away.  (Ex. 58).

54.     Lt. Odom informed that he was running the situation all the way up to his highest authority, the Chief of Police.  (Ex. 58).  He apprised Keister that he was not on public property, needed a grounds use permit, and because he did not have one, if Keister refused to comply, he could receive a trespass warning and eventually get arrested.  (Ex. 58).

55.     As Lt. Odom was speaking with Keister, Officer Liles with UA police department also came to the scene and joined Officers Babb and Ellison, who summarized the situation for him.  (Ex. 61).  Officer Liles then walked to McCray, who was standing outside of hearing range of Keister, and asked her what options Keister was given.  (Ex. 61).  She replied that he could go to the public right-of-way or comply with the policy.  (Ex. 61).

56.     Seeking a way to continue speaking that day, and hoping to avoid a future conflict, Keister asked to find out more about the permit process, and McCray came back to speak with him about it.  (Ex. 58).  Keister shared his inability to comply with the 10-working-day advance notice requirement, but McCray said he should fill out the form online.  (Ex. 58).  Desiring a compromise, Keister asked if he could fill out paperwork once at UA for future visits, but McCray denied the request, insisting Keister comply with the permit process separately for each visit.  (Ex. 58). McCray added that Keister would need a sponsor for his speech.  (Ex. 58).

57.     Keister tried to expound on his constitutional concerns about the permit process, but McCray declined to engage in any discussion, saying she wasn't "debating" about it.  (Ex. 58).

58.     McCray then had Officer Ellison provide Keister her contact information.  (Ex. 58). While this was happening, Lt. Odom walked away, toward Officer Liles and they briefly spoke about who was in the loop about the situation.  (Ex. 61).  Lt. Odom then began speaking to his authority over his phone or radio device.  (Ex. 61).

59.     After providing her contact information, McCray walked away, and approximately five minutes later, Lt. Odom concluded his call and walked back to Keister.  (Ex. 58).  Asserting a flaw in Keister's logic, Lt. Odom claimed Keister was not on public property, and for that reason, his constitutional rights to speak did not apply in that location.  (Ex. 58).

60.     Keister wanted to speak on public property that would give him a good opportunity to reach UA students and others.  (Ex. 1, ¶ 36).  He recalled seeing University Boulevard and felt certain the adjoining sidewalks were public property and accessible for free speech, and he also remembered McCray mentioning this same area as a place to speak.  (Ex. 1, ¶ 36; Ex. 58).

61.     Keister asked Lt. Odom whether University Boulevard is a public street and Lt. Odom confirmed that it is indeed a "municipal street."  (Ex. 58).

62.     Keister then asked whether his move to the corner sidewalks adjoining University Boulevard would resolve the issue, and Officer Babb indicated that UA's policy should not apply there, but municipal ordinances could be invoked there.  (Ex. 58; Ex. 60).

63.     Lt. Odom confirmed that Keister would be trespassed if he resumed speaking at his present location near 6th Avenue and Keister packed his belongings to move.  (Ex. 58).

64.     Officer Babb walked over to Officer Liles and informed him that Keister agreed to relocate to municipal property where municipal ordinances apply.  (Ex. 60).

65.     At that time, McCray joined them and asked Officer Liles if he recalled where UA had put Westboro Baptist Church, and Officer Liles guessed it was in front of Russell Hall.  (Ex.

60; Ex. 61).  McCray confirmed that understanding, describing the corner sidewalk as a "little square" that is not UA property.  (Ex. 60).

66.     Officer Liles mentioned they need to make sure Keister knew he could go to University Blvd. before he left.  (Ex. 60; Ex. 61).  McCray confirmed that location would work for Keister because that is the area UA counsel Mike Spearing said was appropriate.  (Ex. 60).

67.     Officer Liles then called out to Lt. Odom, apprising him that UA's legal office confirmed the University Blvd. corner was a "municipal corner[]" where Keister could go speak. (Ex. 60; Ex. 61).  Lt. Odom confirmed that he recognized the location.  (Ex. 60; Ex. 61).

68.     Lt. Odom advised Keister that the sidewalk at the intersection of University Blvd. and Hackberry Lane, in front of Russell Hall, had been identified as public property where Keister could go and share his message.  (Ex. 56, p. 94, ll. 2-9; Ex. 58; Ex. 62 (Map with Odom's designation of spot)).  "On that corner," Lt. Odom explained, "you're good."  (Ex. 58).  Lt. Odom then gave Keister directions on how to get there.  (Ex. 58).

69.     Keister and Edwards then went to the sidewalk at the northeast corner of University Blvd. and Hackberry Lane.  (Ex. 58).  It looked like a public sidewalk to Keister.  (Ex. 1, ¶ 43).

70.     At that location Keister passed out religious literature by hand and intermittingly preached with his natural voice in short bursts to draw attention to his leafletting.  (Ex. 58).  Neither Keister nor Edwards used amplification.  (Ex. 58; Ex. 1, ¶ 44).

71.     Lt. Odom returned to his vehicle, and while sitting in it, he received a call from McCray, who advised that they had made a mistake about the sidewalks at the intersection.  (Ex. 55, ¶ 46; Ex. 56, p. 103, ll. 13-20).  She instructed Lt. Odom to tell Keister that he would need a grounds use permit to speak on the sidewalks at the corner of University Blvd.  (Ex. 55, ¶ 46).  Lt. Odom walked toward University Blvd. for this purpose.  (Ex. 56, p. 106, l. 12 – p. 107, l. 3).

13

72.     Meanwhile, after sharing his faith without issue at the northeast corner of University Blvd. and Hackberry Lane for 20 to 30 minutes, Keister, along with Edwards, packed up and walked back to their vehicle because it was getting late in the day.  (Ex. 56, p. 108, ll. 14-20).

73.     Meeting and stopping Keister in front of Gallalee Hall, Lt. Odom informed Keister that UA had made a mistake and that Keister would need a permit to hand out literature or speak on the sidewalks at the intersection of University Blvd. and Hackberry Lane.  (Ex. 56, p. 108, ll. 14-20, p. 109 ll. 11-18; VAC, ¶ 74; Answer, ¶ 74).

74.     Keister left, and fearing arrest, he has not returned to the public sidewalks at the intersection of University Blvd. and Hackberry Lane to speak since that day.  (Ex. 1, ¶ 52).

75.     Hoping to recover his right to share his beliefs, Keister sent a letter through counsel on May 3, 2016, to UA officials, recounting his interaction with campus officials, pointing out the constitutional infirmity of policy, and asking for assurance that UA let him engage in his expression on public sidewalks without a need for a permit .  (Ex. 63).  On May 18, 2016, UA counsel responded to Keister's letter, refusing relief and defending UA's policy, focusing on the sidewalk along 6th Avenue.  (Ex. 64).

76.     On June 14, 2016, Keister, through counsel, sent a follow-up letter to UA counsel, clarifying that Keister's primary concern related to speech on the sidewalks at the intersection of University Blvd. and Hackberry Lane, pointing out that the locations are traditional public fora.  (Ex. 65).  Disagreeing with the assessment, UA counsel, by letter dated July 11, 2016, asserted (incorrectly) that UA owned the property "to the back of the curb," including the sidewalk, which, in UA's view, justified the permit requirement and Keister's ouster.  (Ex. 66).

77.     Keister wants to distribute literature and talk with people on the public city sidewalks at the intersection of University Blvd. and Hackberry Lane, but his fear of arrest for trespass prevents him from doing so.  (Ex. 1, ¶¶ 56-57).

## ARGUMENT

Fed. R. Civ. P. 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The initial burden is for the movant to demonstrate the absence of any genuine issues of material fact.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  After which, the burden shifts to the non-movant to show a genuine issue of material fact.  *Id.* at 1116. Conclusory allegations are not enough.  *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

The disputes between the parties in this case are legal, namely, the legal status of the sidewalks at issue and the legal propriety of UA's policy.  Undisputed evidence demonstrates that the sidewalks are traditional public fora and UA's policy and application thereof are unconstitutional restrictions.  Keister is thus entitled to injunctive and declaratory relief to prevent any further unconstitutional application of the policy to his expression and nominal damages to vindicate the extended and wrongful suppression of his speech.

## I.    UA'S POLICY AND ENFORCEMENT AGAINST KEISTER'S SPEECH ON CITY-OWNED SIDEWALKS ARE UNCONSTITUTIONAL

The validity of speech restrictions is guided by consideration of 1) the type of expression, 2) the forum status of locations where the speaker wants to speak, and 3) application of the appropriate level of scrutiny to the restrictions at hand.  *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).  Whatever the propriety of UA's regulations for internal campus activities, or to large events on public sidewalks, UA's policy reaches too far in curbing individual and small group speech on traditional public forum sidewalks.

### A. **Keister's Speech is Constitutionally Protected**

The religious content Keister wants to share with others enjoys full constitutional protection. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). And, the means Keister seeks to utilize – literature distribution and unamplified speaking – also fall under the ambit of the First Amendment free speech clause. *See United States v. Grace*, 461 U.S. 171, 176 (1983) (leafletting protected); *Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943) (spreading religious beliefs through literature distribution and personal visitation protected). UA does not dispute the constitutional protection afforded Keister's desired expression. (*See* Doc. 16).

### B. **Sidewalks at the Intersection of University Blvd. and Hackberry Lane are Traditional Public Fora**

This Circuit recognizes four different kinds of government fora: traditional, designated, limited and nonpublic. *See Bloedorn v. Grube*, 631 F.3d 1218, 1230-31 (11th Cir. 2011). And figuring out the correct forum is a crucial task. "The nature of [government-owned] property determines the level of constitutional scrutiny applied to the restrictions on expression." *United States v. Frandsen*, 212 F.3d 1231, 1237 (11th Cir. 2000).

Keister wants to speak on the sidewalks bordering the intersection of University Blvd. and Hackberry Lane. "A public sidewalk is a 'quintessential public forum[].'" *One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1285 (11th Cir. 1999). This Court and the appellate court, based on the record at the time of the motion for preliminary injunction, deduced that these sidewalks are limited public fora on the belief that they sat on university property internal to – indeed in the "heart" of – UA. But, as now established, the sidewalks are on property owned and controlled by the City of Tuscaloosa. They are not deep inside UA's campus but on its periphery, outside its borders, making them traditional public fora as a matter of law. Moreover, the appearance and function of the sidewalks are harmonious with this traditional status.

16

### 1. Sidewalks are City-Owned and Traditional Public Fora as a Matter of Law

The record confirms that sidewalks on the northeast and southeast corners of the intersection of University Blvd. and Hackberry Lane are on city-owned[1] property lying outside the borders of (and certainly not in the "heart" of) UA's campus. A map from UA's Department of Land Management reveals the sidewalks on the northeast and southeast corners of the relevant intersection fall outside the yellow lines superimposed on the map representing the boundaries of UA-owned property. (Ex. 5; *see* Ex. 56, pp. 70-72).[2] UA does not own the property where these sidewalks are located. Rather, these sidewalks running with city streets are owned and controlled by City of Tuscaloosa. (Ex. 7 [detailing ownership of right-of-way encompassing University Blvd. from Alberta Bridge to Wallace Wade Ave.]). Exercising its control as owners, the City gave UA a revocable, non-exclusive license to construct and maintain sidewalks. (Ex. 7, pp. 2-3). But the City always retained right of access to these sidewalks for public pedestrian use. (Ex. 7, p. 2).

This understanding of the City's ownership and control over the sidewalks stands in stark contrast to the assumption of university ownership accepted at the preliminary injunction stage. Keister initially believed the City held an easement on the sidewalks. (VAC, ¶ 38).[3] This Court and the Eleventh Circuit relied extensively on the premise that the sidewalks are university sidewalks located on UA campus property (specifically, in the "heart" of campus) in holding them limited public fora. *See Keister*, 879 F.3d at 1289, 1291 nn. 5, 7. But these erroneous presumptions no longer hold. As ordinary city sidewalks, the pathways must be deemed traditional public fora.

---

[1] Of course, city ownership is not a strict requirement for public forum status. *Hague v. CIO*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest . . ."). But city ownership does settle the matter.

[2] This map is accurate down to three inches on the ground. (Ex. 5).

[3] This thought derived from the insistence by UA counsel that UA controlled the property bordering University Blvd. "to the back of the curb," (Ex. 66), and the property deed for Russell Hall which recognizes the existence of "easements." (Deed Exhibit to MPI [Docs. 6-4 and 6-5]).

*See Int'l Caucus of Labor Committees v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997) (recognizing "city sidewalks" as traditional public fora); *see also Keister*, 879 F.3d at 1291 n. 7 (acknowledging a different analysis may apply if sidewalk is not in "heart" of campus).

City-owned public ways do not require in-depth analysis. *See Frisby v. Schultz*, 487 U.S. 474, 481 (1988) (no particularized inquiry necessary to deem a public way a traditional public forum). In such venues, the city-secured right of general access ensures the right to speak. *Jamison v. Texas*, 318 U.S. 413, 416 (1943). Therefore, public rights-of-way are viewed as traditional public fora as a matter of law. *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2528 (2014) (recognizing "public way[s]" as traditional public fora); *Tucker v. City of Fairfield, Ohio*, 398 F.3d 457, 463 (6th Cir. 2005) ("a public right-of-way…is a traditional public forum").[4]

The granting of a special use license or permit to a non-city entity does not affect the calculus. The arrangement for maintenance cannot work to deny rights-of-way or the sidewalks upon them of their traditional public forum status, particularly, with the City retaining right of access for pedestrian use. Courts have consistently held city-owned streets, sidewalks, and parks do not lose their traditional forum status when the city grants a special use permit to a private entity as long as those areas remain free and open to the public. *See, e.g., Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098-99 (8th Cir. 2013) (city-owned park during permitted festival); *Startzell v. City of Philadelphia*, 533 F.3d 183, 196 (3d Cir. 2008) (city-owned streets and sidewalks during permitted festival); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (city streets during permitted art festival); *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1098 (N.D. Fla. 2016) (city-owned park during licensed event). The sidewalks

---

[4] This is not a case where otherwise public rights-of-way have been blocked off for special events. Though UA, during football season, does block off some streets for "Game Day," (Ex. 57, pp. 36-37) no such special occasion is at play here.

18

adjacent to UA campus lie on city-owned property and are free and open to the public at virtually all times and are thus traditional public fora – regardless of UA's non-exclusive use license for maintaining the sidewalks.

### 2.   Objective Function and Appearance of Sidewalks Confirm Traditional Public Fora Status

The issue at the preliminary injunction stage was whether the appearance and function of (what was believed to be) non-city sidewalks was sufficiently public in nature to require they be treated like city sidewalks.  Ample authority supports this conclusion under certain circumstances, transforming an area owned by a government proprietor or private entity into a traditional public forum.  *See, e.g., United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 452 (6th Cir. 2004) (privately-owned sidewalk); *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012) (university-owned sidewalk).   However, such factors cannot justify treating a city-owned sidewalk as though it is something less than a traditional public forum.  *See, e.g., ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1102-03 (9th Cir. 2003) (city-owned pedestrian mall held to be traditional public forum despite decorative pavement, overhead canopy, and vehicular barriers because "cosmetic differences, such as distinctive pavement and landscaping, are insufficient to distinguish an area from surrounding public forums."); *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 576 (9th Cir. 1993) (area of city-owned park could not lose it traditional public forum status by virtue of blue line demarcations on the pavement).  No matter the indicia found on the property or in its surroundings, a city-owned sidewalk cannot forfeit its traditional status when the area is open and free to the public.  *See Johnson*, 729 F.3d at 1098-1101 (interior of festival in city park was traditional public forum despite presence of exhibitor booths); *Parks*, 395 F.3d at 645-46, 652 (city streets within festival area demarcated by barricades remained traditional public fora despite presence of barricades, vendors, and performing artists).

Here, the appearance and function of the city-owned sidewalks provide a separate basis for substantiating their traditional public forum status.  The sidewalks at the intersection are made of the same material as the other city sidewalks to which they connect.  (Exs. 2, 3, 4, 15, 23, 47, 48, and 50).  They are outside of the decorative fencing in the vicinity.  (Exs. 2, 3, 4).  The City seal is emblazoned on the street signs overhead.  (Ex. 31; Ex. 32).  And, these sidewalks provide continuous access alongside various non-university buildings in the vicinity, including two churches on that same block, and a PNC Bank nearby as well.  (Ex. 5; Ex. 26; Ex. 50).  Given city-ownership and control of the property, the use of these sidewalks by the pedestrian public reflects their very purpose, not by virtue of UA's permission, but via City's intentions.  (Ex. 7, p. 2).  And, the right of public pedestrian access retained by the city is significant as well, ensuring free speech rights are consistently respected.  *See, e.g., Brindley v. City of Memphis*, 934 F.3d 461, 469-70 (6th Cir. 2019) (dedication of privately-owned street to public use supported traditional public forum status); *Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd. of Las Vegas*, 257 F.3d 937, 945-46 (9th Cir. 2001) (pedestrian right of way, as secured by city-owned servitude, supported traditional public forum status because it eliminated title-holder's "right to exclude others.").

Within feet of the intersection are several properties owned by private entities, including the Baptist Ministry and PNC Bank to the east and the Episcopal Church and Catholic Church to the south.  (Ex. 5; Ex. 26; Ex. 50).  The city-owned sidewalks provide general pedestrian passage to and from these private, non-UA properties.  There is nothing specialized about the sidewalks at issue indicating they are set aside purely for access to educational buildings.  *Cf. United States v. Kokinda*, 497 U.S. 720 (1990) (contrasting municipal thoroughfare sidewalk with specialized sidewalk leading only to post office entrance).  UA's campus is but one destination among many for access and travel.

20

True to their nature and purpose, nothing separates the sidewalks from the streets of which they are legally the same part and parcel. (Exs. 2-5). *See Grace,* 461 U.S. at 179-80 (distinguishing sidewalks around Supreme Court building from those in *Greer v. Spock*, 424 U. S. 828 (1976), which were "separated from the streets and sidewalks of any municipality."). Much like the sidewalks specified in *Grace*, the sidewalks at the intersection of University Blvd. and Hackberry Lane do not give any signals to pedestrians that they have suddenly left the City and entered UA campus, because, in fact, they have not done so. (Exs. 2-4). Harmonious with the reality of these sidewalks, a casual observer perceives the sidewalks on the northeast and southeast corners of the intersection are municipal sidewalks outside of campus – just as UA officials themselves correctly understood on March 10, 2016 (before they didn't). (Ex. 58; Ex. 60; Ex. 61). These city-owned sidewalks can "not lose [their] historically recognized character for the reason that [they] abut[] government property that has been dedicated to a use other than as a forum for public expression." *Grace,* 461 U.S. at 180; *cf. McGlone*, 681 F.3d at 733 (sidewalks on perimeter of university campus are traditional public fora).

### C. UA's Permitting Restrictions are Unconstitutional

UA's policy and application are unconstitutional, eliminating virtually all forms of expression by non-university individuals. While UA's justification purportedly centers on preventing disruption on campus, its policy is not limited to activities that have a realistic possibility of causing a disruption. UA applies its policy against essentially all types of speech, including mere literature distribution by a lone individual on city sidewalks outside campus. As UA officials explained on the scene in threatening Keister with arrest, the permit requirement applies to "any outdoor activity" including "distribution of literature and conversation." (VAC, ¶ 59; Answer, ¶ 59; Ex. 58). And, once speech qualifies for restriction under the policy, it is completely banned unless the speaker finds a UA-approved university entity willing to sponsor his

speech and submits a request to speak 10 working-days in advance.  (Ex. 53, pp. 1, 3).  If no recognized UA entity is willing to sponsor Keister's speech, his speech cannot be uttered in any manner on public sidewalks.  (Ex. 57, p. 49, l. 18 – p. 50, l. 18).  And, even if he secures a sponsor, Keister is obliged to only speak and behave in ways that meet with the sponsor's approval.

As a prior restraint on speech, UA's policy bears a particularly heavy presumption of constitutional invalidity.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  In traditional public fora (like here), restrictions must 1) be content-neutral, 2) be narrowly tailored to serve a significant government interest, 3) leave open ample alternative channels of communication, and 4) refrain from delegating unbridled discretion to the licensing official.  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).  And, regardless of the forum classification, any restriction must at least be reasonable and viewpoint-neutral.  *Bloedorn*, 631 F.3d at 1231.

### 1.  UA's Grounds Use Policy is Unconstitutional in Traditional Public Fora

In traditional public fora, application of UA's policy to Keister's small-scale literature distribution and unamplified speech violates the First Amendment.  The policy applies unless the content of the speech qualifies as "casual recreational or social activities," rendering the restriction content-based and hopelessly vague.  Also, if the policy applies, a would-be speaker like Keister is silenced unless he can secure a sponsor for his content, a process involving the unbridled discretion of third parties and risks of censorship.  Moreover, the imposition of a permit requirement on individual and small-scale literature distribution and unamplified speech is not narrowly tailored to prevent potential disruption or any other legitimate government concern.  And, as a result, UA's application of its policy also fails to leave ample alternatives for speech.

### a.  Restricting Speech Whose Content is Not Deemed "Casual Recreational or Social Activities" is Unconstitutionally Vague

In determining whether speech is subject to UA's permit requirement, UA's policy considers whether the speech constitutes "casual recreational or social activities." The policy does not define those terms and neither are they self-explanatory. (*See* Ex. 53). For this reason, this provision is vague, violating Due Process.

UA offers no explanation for the meaning of this operative phrase. Sans definition, the vague language empowers UA officials to decide for themselves what is "casual" (with no standards to go on) and shut down speech for lack of permit. This gives UA officials opportunity to censor controversial topics or disagreeable viewpoints by simply concluding the speech is not "casual", while leaving others who lack a permit but have more favorable viewpoints alone. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 576 (1987) (noting significant vagueness problem in allowing airport to decide whether certain minor forms of speech were "airport-related" (and thereby exempt from speech-restrictive policy) because of the threat of censorship). Vagueness like that found here is peculiarly problematic for permit schemes, because if the speaker miscalculates, he is forced to cease his expression entirely for lack of permit. The Fourteenth Amendment's requirement of clarity is especially high where protected speech is implicated. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Because UA's "casual" exception is vague and enables censorship, it is unconstitutional in any forum type.

### b.  Restricting Speech Whose Content is Not Deemed "Casual Recreational or Social Activities" is Content-Based

In addition to being vague, the "casual recreational or social activities" exception implicates the content of speech. Whatever the meaning of the phrase "casual recreational or social activities" happens to be, any evaluation must necessarily consider the content of the speech. One cannot tell whether a speaker handing a piece of paper to someone else is "casual recreational or social" unless one evaluates the content contained in the document. If Keister and another

23

individual discuss sports as they traverse the sidewalks, their expression is likely deemed exempt as "recreational" speech, but if the conversation turns to the merits of Keister's religious beliefs, then, it is likely no longer "casual recreational or social," but an "event" requiring a permit. The permit scheme is unavoidably and impermissibly content-based.

### c. Sponsorship Requirement Vests Unbridled Discretion for Licensing Speech

Once it is determined that a speaker's content is not "casual recreational or social," UA mandates the speaker find third parties (namely, UA-approved student groups or UA faculty or administrators) willing to approve of the speech for it to be uttered. Mandating the need for a sponsor, UA supplies no criteria on whether sponsorship should be granted, leaving it entirely to the whims of each UA entity to decide whether to sponsor the speech or not. (Ex. 55, ¶ 24).[5]

Permit requirements on speech are not permissible under the First Amendment unless they supply narrow, objective, and definite criteria to guide the decision. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969). Conspicuously omitting such standards, UA give university entities the power to "decide who may speak and who may not based upon the content of the speech or the viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988). This is the very harm the prohibition against unbridled discretion is designed to prevent. *Shuttlesworth*, 394 U.S. at 151.

This Court, in considering this question on the motion for preliminary injunction, indicated that such discretion is appropriate since UA itself is not involved in the decision-making process. But since UA officials are also decision-makers, this assumption is not entirely correct. And, of course, we now know the restriction takes place in traditional public fora and must be more than

---

[5] UA does not allow individual students to sponsor speakers like Keister. (Ex. 57, p. 49, ll. 3-17). So, if one, or even many, students want Keister to speak on campus, Keister is still banned if registered student organizations and UA faculty oppose his viewpoints and refuse sponsorship.

reasonable and viewpoint neutral: the restriction must refrain from vesting unbridled licensing discretion. *Forsyth Cnty.*, 505 U.S. at 130, 134-135 (holding fee requirement that turned on administrator's whim and anticipated audience reaction failed these requirements). By subjecting speech to unfettered discretion of private groups and university departments, UA's sponsorship requirement cannot survive in a traditional public forum.

### d. Permit Requirement and Associated Burdens on Individual and Small Group Expression are Not Narrowly Tailored

Further, UA's imposition of permit requirement on small-scale speech like Keister's in traditional public fora is not narrowly tailored to meet a significant government interest. Narrow tailoring demands a speech restriction not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). The test is rigorous, requiring a restriction "eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485. While large-scale expression, such as a parade, rally, or a concert, can conceivably generate logistical concerns warranting a permit, *see Forsyth Cnty.*, 505 U.S. at 130, no such concerns are prompted by individual and small group literature distribution and unamplified expression occurring on public, city sidewalks.[6]

Permit requirements to individual and small-group speech are offensive "not only to the values protected by the First Amendment, but to the very notion of a free society…." *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 165-66 (2002). In light of the open nature of public sidewalks, courts have uniformly held permit requirements on

---

[6] To justify its application of the policy to Keister's small-scale expression on the sidewalks at issue, UA must show that it is narrowly tailored in that precise context; it is legally insufficient to show that its policy is narrowly tailored as-applied to *other* activities, namely, large or disruptive activities in the middle of campus. *See, e.g., Saieg v. City of Dearborn*, 641 F.3d 727, 739-40 (6th Cir. 2011) (holding pedestrian leafletting restriction was not narrowly tailored because it bore insufficient nexus to ostensibly significant interest in vehicular traffic control, regardless of whether restricting street vending in that area would be appropriate).

individual and small-group expression in these venues are not narrowly tailored.  *See, e.g.,*
*Marcavage v. City of Chicago*, 659 F.3d 626, 635 (7th Cir. 2011) (recognizing "powerful
consensus" among circuits that permit requirements cannot be applied to groups of ten and fewer);
*Knowles v. Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("[O]rdinances requiring a permit for
demonstrations by a handful of people are not narrowly tailored to serve a significant government
interest."); *Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005) ("[T]he unflinching
application of the Ordinance to groups as small as two or three renders it constitutionally infirm.");
*Parks v. Finan*, 385 F.3d 694, 705-06 (6th Cir. 2004) (permit requirement applicable to lone
individual's expression was not narrowly tailored); *Cmty. for Creative Non-Violence v. Turner*,
893 F.2d 1387, 1392 (D.C. Cir. 1990) (invalidating permit requirement because it could apply to
groups as small as two).  The Eleventh Circuit concurs with the growing consensus.  *See Burk v.
Augusta-Richmond County*, 365 F.3d 1247 at 1255 n. 13 (11th Cir. 2004) (application of permit
scheme to group of five was not narrowly tailored).

And this consensus was reached for good reason: individual and small group expression
does not cause disruption or monopolize the use of sidewalks that are already free and open to the
public.  *See Lederman v. United States*, 291 F.3d 36, 45 (D.C. Cir. 2002) (government cannot
distinguish between demonstrators and pedestrians without evidence that demonstrators pose a
greater risk to identified government interests).  Keister's expression, in particular, does not draw
crowds or attempt to do so, creating no need for UA officials to prepare or coordinate in advance.

UA's permitting system, in forcing individuals to secure permission from governmental
authorities in advance is a deterrent from speaking at all.  *See Grossman v. City of Portland*, 33
F.3d 1200, 1206 (9th Cir. 1994) ("Both the procedural hurdle of filling out and submitting a written
application, and the temporal hurdle of waiting for the permit to be granted may discourage

potential speakers."). And, the permit's procedural requirements burden speech even further. For Keister to hand out a piece of paper with a religious message on city sidewalks, he must familiarize himself with UA-approved entities, introduce himself and his desired message to them, find a UA-approved entity willing to sponsor his content and methodology, fill out the required paperwork, and ensure the paperwork is submitted a full 10 working-days in advance. The procedure is extreme for leafleting. *See Finan*, 385 F.3d at 703 (in challenge to permit requirement applicable to individual leafletting, explained scheme's procedural hurdles rendered it "pretty close in its effect to an outright prohibition."). Considering Keister's plight, these burdens prohibit him from speaking on campus. As a travelling missionary, he does not know potential sponsors and has no ability to get acquainted with them. (Ex. 1, ¶ 29). And, even if he found a UA-approved entity willing to sponsor his speech, weather and other factors make it impossible for him to know in advance what day he would be in Tuscaloosa, much less 10 working-days in advance. (Ex. 1, ¶ 30). UA's dogged application of its permit requirement to Keister's speech effectively keeps Keister from speaking on campus at all – at no (legitimate) benefit to UA.

### e.  Grounds Use Policy Does Not Leave Open Ample Alternatives

Neither does UA's policy and application of it leave ample alternatives for Keister's speech. This failure is an additional basis for invalidating the restrictions. *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). UA's policy reaches virtually all forms of expression, prohibiting Keister from speaking in any manner as a lone individual or part of small group on a public city sidewalk. Keister strongly desires to reach UA students with his message, but UA's policy prevents him from speaking in any manner on city-owned sidewalks near campus, depriving him of his intended audience. *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1183-84 (11th Cir. 2009) (restriction that prevents speaker from reaching their audience fails to leave ample alternatives). That Keister may speak to someone else, somewhere else, within the city limits of Tuscaloosa is a poor

substitute.  "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939).  UA's application of its policy does not leave Keister with viable alternatives that allow him to reach UA students with his message.

### 2. Regardless of Forum Classification, a 10-Working-Day Advance Notice Requirement is Unconstitutional

UA's 10-working-day advance notice requirement on small-scale expression, including hand distribution of religious literature by an individual, is so burdensome and unrelated to legitimate interests that it is patently unreasonable, and thus unconstitutional, regardless of forum status of the sidewalks in question.  *See, e.g., Bloedorn*, 631 F.3d at 1231 (in limited public fora, speech restrictions must, at a constitutional minimum, be reasonable and viewpoint-neutral).[7]

By counting working days, the notice requirement effectively requires at least 14 calendar-days' notice, and even more if there are intervening holidays.  That is seven times longer than the 48-hour advance notice requirement that the Eleventh Circuit upheld in *Bloedorn*. 631 F.3d at 1240.[8]  In assessing the reasonableness of a speech restriction, context of the precise forum is important.  *Id.* at 1231.  The court in *Bloedorn* upheld that much shorter notice period because the location at issue was located in a high-traffic area in the middle of campus.  *Id.*  In comparison, the off-campus city-owned sidewalks at issue are open to public pedestrian traffic, border city streets, and are hundreds of feet from the nearest UA buildings.  In such a wide-open space, a 10-working-day advance notice is too much and plainly unreasonable.

---

[7] Though a permit *may* be granted in as few as 3 days (if multiple department approvals are not required), that does not alter the requirement of submitting the request 10 working-days in advance.

[8] It is also twice as long as the advance notice requirement reviewed by the panel in *Sonnier v. Crain*, 613 F.3d 436, 444-446 (5th Cir. 2010).

UA offers no justification for its requirement beyond a generic need to "prepare." (Doc. 16, p. 13). No preparation whatsoever is needed for small-scale expression like Keister's when conducted on public sidewalks that remain open to general pedestrian traffic because it causes no disruption to the normal activity of such places. *See, e.g., Grossman*, 33 F.3d at 1207-08 (holding application of seven-day advance notice requirement for group of six to eight people holding signs or "making an address" unconstitutional because such activity is harmless on open thoroughfares). The requirement is thus unconstitutional regardless of the forum status assigned to the sidewalks. *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 690-92 (1992) (ban on literature distribution in nonpublic forum airport unconstitutional because it is harmless).

## II.    KEISTER IS ENTITLED TO HIS REQUESTED RELIEF

As demonstrated, UA's application of its policy to effectively ban Keister's small-scale expression on public sidewalks off UA's campus violates Keister's constitutional rights, entitling him to injunctive and declaratory relief to stop the ongoing violation on his rights to distribute literature and visit with people on city-owned sidewalks.

Keister also deserves nominal damages against Lt. Odom in his individual capacity for the threat of arrest that suppressed his constitutional rights. Lt. Odom informed Keister that under UA's policy, he was prohibited, under threat of criminal arrest, from distributing literature or speaking with his unamplified voice on the sidewalks on the corners of Univ. Blvd and Hackberry Lane – city-owned property. (VAC, ¶ 74; Answer, ¶ 74). For the forced silence imposed on him, Keister is entitled to receive nominal damages in the amount of $1.00 against Lt. Odom in his individual capacity. *See KH Outdoor, LLC v. City of Trussville*, 465 F.3d 1256, 1260 (11th Cir. 2006) (award of nominal damages is appropriate to remedy violation of First Amendment rights).

## CONCLUSION

For the reasons stated herein, there are no genuine issues of material fact, and Plaintiff Rodney Keister is entitled to judgment as a matter of law.  He respectfully prays this Court grant his Motion for Summary Judgment.

Respectfully submitted,

s/ Nathan W. Kellum                       s/ Jason Tingle
Nathan W. Kellum*                         Jason Tingle
TN BAR #13482; MS BAR #8813               JAUREGUI & LINDSEY, LLC
CENTER FOR RELIGIOUS EXPRESSION           244 Inverness Center Dr.
699 Oakleaf Office Lane, Suite 107        Suite 200
Memphis, TN 38117                         Birmingham, AL 35242
(901) 684-5485 – Telephone                205-909-2233 – Telephone
(901) 684-5499 – Fax                      205-970-3886 – Fax
nkellum@crelaw.org                        jtingle@jandllawfirm.com

Attorney for Plaintiff Rodney Keister     Attorney for Plaintiff Rodney Keister
*Pro Hac Vice Admission

s/ Walter M. Weber
Walter M. Weber*
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., N.E.
Washington, DC 20002
(202) 546-8890
wmweber@aclj-dc.org

Attorney for Plaintiff Rodney Keister
*Pro Hac Vice Admission

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2019, the foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system, and that notice of this filing will be sent electronically to all counsel of record by operation of the Court's CM/ECF system..

/s/Nathan W. Kellum
Attorney for Plaintiff