## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **RODNEY KEISTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:17-cv-00131-RDP** |
| | } | |
| **STUART BELL, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the parties' cross Motions for Summary Judgment. (Docs. # 59, 60). The motions are fully briefed. After careful consideration, and for the reasons explained below, the court finds that Defendants' Motion for Summary Judgment (Doc. # 59) is due to be granted, and Plaintiff's Motion for Summary Judgment (Doc. # 60) is due to denied.

## I.    Background[1]

The facts of this case have been briefed (repeatedly) by the parties. This court (*see* Docs. # 22, 49), and the Eleventh Circuit, *Keister v. Bell*, 879 F.3d 1282, (11th Cir. 2018), *cert. denied*, 139 S. Ct. 208 (2018), have addressed requests for interim relief. Although the material facts that form the basis of Plaintiff's Complaint have not substantially changed, the parties, after conducting extensive discovery, have presented their fact submissions and legal arguments. Thus, the court once again dives in and reviews the undisputed Rule 56 facts.

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Plaintiff Rodney Keister ("Keister") is a traveling Christian missionary, who is personally dedicated to glorifying God through the public sharing of the gospel in public areas throughout the nation. (*Id*. at ¶¶ 12-13). His basic message is that whoever trusts in Jesus Christ will be saved from their sins. (*Id*. at ¶ 25). As part of his ministry, he presents the merits of Christianity by preaching, handing out religious literature ("gospel tracts"), and engaging people in one-on-one conversations and prayer.  (*Id*. at ¶¶ 17-19). Keister has a sincere desire to reach out to college-aged students, and he regularly visits college and university campuses. (*Id.*). He typically conveys his message on public sidewalks. (*Id.* at ¶ 15). He generally does not draw large crowds, nor does he intend to do so. (*Id*. at ¶¶ 21, 22). He does not hinder pedestrian traffic, solicit or ask for money, harass passersby, or litter. (*Id*. at ¶¶ 22, 23). Keister is sometimes accompanied in his sidewalk evangelism by one or two friends. (Doc. # 39 at ¶¶ 24).

On March 10, 2016, Keister arrived at the University of Alabama ("University" or "UA"). (*Id*. at ¶ 29). The University is a state-funded public university located in Tuscaloosa, Alabama. (*Id*.). Around 4:00 p.m., Keister and a companion began speaking with passersby and distributing literature on the University's campus. (*Id.* at ¶¶ 45, 54).  Keister's companion briefly used a megaphone while speaking, but Keister did not. (Doc. # 59-4 at 20-21).  The duo were located on a sidewalk on UA's campus next to 6th Avenue, near the corner of Smith Hall and Lloyd Hall. (Doc. # 39 at ¶ 52). Shortly after Keister and his companion began their sidewalk evangelism, they were approached by the campus police and a University representative, who informed them that they could not continue their activities because University policy required a grounds use permit before engaging in such expressive conduct. (*Id.* at ¶¶ 55-57). The University representative confirmed that the "campus is open to the public, and Keister was allowed to be there, but he could not engage in his preferred forms of expression on the University's campus without first obtaining

a [grounds use] permit." (*Id.* at ¶ 60).

Because Keister and his companion did not have a grounds use permit, they moved to the sidewalk at the intersection of University Boulevard and Hackberry Lane (the "intersection"). (*Id.* at ¶¶ 60-65). Keister testified that he picked this spot for two reasons. First, he believed it was a public city sidewalk, as opposed to UA property (where he would be required to apply for and receive a grounds use permit). (*Id.*).  Second, Keister contends that while speaking with a campus police officer on 6th Avenue, Keister specifically proposed that he move locations and preach on the sidewalks at the University Boulevard and Hackberry Lane intersection. (*Id.*).  In response, the campus police officer stated, "[o]n that corner, you're good." (*Id.* at ¶ 68).

Shortly after arriving at the intersection of University Boulevard and Hackberry Lane, Keister was again approached by UA campus police, who informed him that the intersection (and its contiguous sidewalk) were indeed part of UA's campus, and UA's grounds use policy applied at that location as well. (*Id.* at ¶ 73). Fearing arrest for criminal trespass, Keister left UA's campus and has not returned.[2] (*Id.* at ¶¶ 74). Keister testified that he "fervently desires" to return to the public sidewalks next to public streets flowing through UA's campus. (*Id.* at ¶¶ 77, 86). Specifically, Keister wishes to return to the sidewalks situated at the corner of University Boulevard and Hackberry Lane and share his message with UA students and others affiliated with the University. (*Id.*).

On January 25, 2017, Keister filed his complaint in this court alleging violations of 42 U.S.C. §§ 1983 and 1988, and asserting that UA's grounds use policy violates the First

---

[2] Keister's Amended Complaint states that "[he] along with [his companion], packed up and walked back to their vehicle because it was getting late in the day." (Doc. # 39 at ¶ 72). In his deposition, Keister stated that he and his companion left the corner because the weather "turned" and it started raining. (Doc. # 59-4 at 32-33). Although the reason Keister and his companion began packing up is contested, it is undisputed that the duo were approached by a campus police officer and threatened with arrest for trespass, departed, and have not returned

Amendment's free speech clause and the Fourteenth Amendment's due process clause. (Doc. # 1). The next day Keister filed a Motion for Preliminary Injunction. (Docs. # 6, 7). In his Motion, Keister argued the University's ground use policy violates the First Amendment, and that the University should be enjoined from enforcing its ground use policy because the intersection of University Boulevard and Hackberry Lane is a traditional public forum and the policy cannot withstand scrutiny. (*Id.*). This court set an expedited briefing schedule and held a preliminary injunction hearing. (Docs. # 8, 16). After the hearing, this court issued a written opinion and denied Keister's Motion. (Docs. # 22, 23). In its Memorandum Opinion, the court determined that the intersection was a limited public forum, and the grounds use policy satisfied the requisite level of scrutiny. (Doc. # 22).

Keister appealed the ruling. (Doc. # 26). The Eleventh Circuit affirmed, holding that this court properly determined the intersection at issue is a limited public forum within UA's campus. *Keister*, 879 F.3d at 1291. Keister filed a petition seeking rehearing *en banc*, but his request was denied. Keister then petitioned the Supreme Court for a writ of certiorari. That petition was also denied.

After the Supreme Court denied certiorari, the parties continued litigating in this court. Keister filed an amended complaint, again alleging violations of both the First Amendment and the Due Process Clause. (Doc. # 39). In response, Defendants filed a Motion to Dismiss Keister's Amended Complaint (Doc. # 41), which the court denied. (Docs. # 49, 50). On October 10, 2019, the parties filed cross Motions for Summary Judgment. (Docs. # 59, 60). Those have been fully briefed and are now ripe for decision.

### A.    The Intersection and Sidewalk

University Boulevard and Hackberry Lane are city streets that run through and beyond the

perimeter of UA's campus. (Doc. # 39 at ¶¶ 34-36). Sidewalks abound both University Boulevard

and Hackberry Lane. (*Id.* at ¶ 37). At the preliminary injunction stage, the district court found that

the sidewalks were located in the "heart" of UA's campus. (Doc. # 22 at 3). In its opinion affirming

this court's denial of Keister's Motion for Preliminary Injunction, the Eleventh Circuit stated:

> Because Mr. Keister pled in his Complaint that the intersection is within UA
> campus's bounds, we need not resolve the parties' disputes as to who maintains and
> owns the sidewalks at issue. What is clear is that the intersection is within UA's
> campus and UA treats it as such, as the district court found. And that is all that
> matters for our purposes today. *See Bloedorn*, 631 F.3d at 1233 (11th Cir. 2011)
> ("Publicly owned or operated property does not become a public forum simply
> because members of the public are permitted to come and go at will. Instead, we
> look to the traditional uses made of the property, the government's intent and policy
> concerning the usage, and the presence of any special characteristics.") (internal
> quotations and citations omitted)).

*Keister*, 879 F.3d at 1290 n.5. On remand, Keister amended his complaint and now claims that the

intersection at the intersection of University Boulevard and Hackberry Lane is *near* UA's campus,

but not on it, inside it, or a part of it.  (Doc. # 39 at ¶¶ 28-44). The below map shows the circled

location of the intersection in reference to the outer limits of UA's campus:



(Doc. # 59-2 at ¶ 34, Exh. A). Further, Keister claims that newly presented evidence shows that

the corner sidewalks are city property, not UA property. (Doc. # 60-8 at 4). Defendants, of course,

dispute that the city owns the sidewalks. (Doc. # 63 at 15-16).[3] Although the parties dispute

---

[3] Although ownership of the sidewalks at issue is disputed, the dispute is not material. *See infra* pp. 11-12.

whether the city or the University owns the sidewalks at the intersection, it is undisputed that they are maintained by the University. (Doc. # 22 at 3 n.4; Doc. # 60-7; Doc. # 63 at 15-16)

The University is not fenced-off, gated, or otherwise self-contained. (Doc. # 39 at ¶¶ 30, 31). The intersection at issue is surrounded by UA buildings and is approximately one block from UA's famous Quad. (Doc. # 59-2 at ¶ 34). Visible from the intersection are numerous UA facilities and landmarks. (*Id.* at ¶ 35). Russell Hall, where Keister was preaching, sits at the northeast corner of the intersection. (*Id.*). Gallalee Hall and a UA Parking lot (with a sign restricting its use to UA faculty and staff) occupy its northwest corner. (*Id.*). The southwest corner includes Farrah Hall, and its adjacent UA-only parking lot. (*Id.* at ¶ 36). A park sits at the intersection's southeast corner. (*Id.* at ¶ 34, Exh. D-Q). About a block away from the intersection on Hackberry Lane, there are a smattering of private businesses (namely, a PNC Bank and an Arby's) mixed in among the UA buildings. (Doc. # 59-4 at ¶¶ 14-19). There are streetlamps at the intersection, and University signs hang from the streetlamps. Doc. # 59-2 at ¶ 39). The street signs at the intersection display the script "A" logo of the university. (*Id.* at ¶ 37). Landscaping fences, which run throughout UA's campus, are on each corner of the intersection. (*Id.* at ¶ 38).

B.    **UA's Grounds Use Policy**

UA's grounds use policy is intended to "preserve[] the primacy of the university's teaching and research mission" and "facilitate the responsible stewardship of institutional resources and to protect the safety of persons and the security of property." (Doc. # 59-2 at 9). The policy governs how, when, and where those who are unaffiliated with the University may speak publicly on campus. (*Id.*). Sidewalks are specifically included in the definition of "grounds" by the University. (*Id.* at 10).

To obtain approval to speak publicly at the University, an unaffiliated person must: (1) be sponsored by or affiliated with a University academic or administrative department or registered student organization; and (2) complete a grounds use permit (sometimes referred to as a "GUP"). (*Id*. at 9-10). The policy states that applicants for a GUP "should request permission for such use ten (10) working days prior to the [e]vent."[4] (*Id.* at 12). According to the University, the notice requirement is necessary "to facilitate the review by all the different University department that have responsibility for the various aspects of an [e]vent (*i.e.*, tents, food service, UAPD, electrical services, etc.)[.]" (*Id.*). The Policy provides that, "[i]f an [e]vent does not involve factors that require multiple University department approvals, approval may be given in as few as three (3) days, if the GUP form is filled out completely and accurately."[5] (*Id.*).

The University will approve a GUP application unless there is reason to believe that one or more of the following are present:

a) The applicant, if a student or a recognized student organization, is under a disciplinary penalty withdrawing or restricting privileges made available to the student or a recognized student organization[ ], such as use of a facility.

b) The proposed location is unavailable at the time requested because of events previously planned for that location.

c) The proposed date or time is unreasonable given the nature of the Event and the impact it would have on University resources.

d) The Event would unreasonably obstruct pedestrian or vehicular traffic.

---

[4] The University does make an exception to the ten-day advance notice policy for "counter-events" and "spontaneous events." (Doc. # 59-2 at 12). A counter-event is defined by the policy as one that is "occasioned in response to an Event for which a GUP has been issued[.]" (*Id.*). A spontaneous event is defined as one that is "occasioned by news or issues coming into public knowledge within the proceeding two (2) calendar days[.]" (*Id.*). For both of these events, "an expedited request for a GUP may be made by a University affiliate" and "the University will attempt to accommodate and provide access to the University Affiliate within twenty-four (24) hours, to an area of the Grounds which is available and which does not interfere with regular academic programs or scheduled events and programs." (*Id.*). Keister's desired expression does not constitute a "counter-event" or a "spontaneous event." Thus, Keister does not qualify for an expedited request for a grounds use permit.

[5] The average approval time for a grounds use permit is 4.4 days. (Doc. # 59-7).

e) The Event would prevent, obstruct, or unreasonably interfere with the regular academic, administrative, or student activities of, or other approved activities at, the University.

f) The Event would constitute an immediate and actual danger to University students, faculty, or staff, or to the peace or security of the University that available law enforcement officials could not control with reasonable effort.

g) The University Affiliate on whose behalf the application is made has on prior occasions:

1) Damaged University property and has not paid in full for such damage, or

2) Failed to provide the designated University official with notice of cancellation of a proposed activity or Event at least two (2) University working days prior to a scheduled activity or Event.

(*Id.* at 13). If a GUP application is denied, there is an appeal process. (*Id.* at 14-15). Keister has not availed himself of the grounds use policy or the appeals process, nor does he plan to do so. (Doc. # 59-4 at 46).

## II.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

9

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.  Analysis

The court has carefully reviewed the Rule 56 record and analyzed the parties' claims under the appropriate legal frameworks. The court has determined that the cross motions for summary judgment and Rule 56 record present three issues key issues for the court's consideration: (1) does Keister have standing to assert his claims?; (2) if so, has Keister presented evidence sufficient to show that the intersection of University Boulevard and Hackberry Lane is, in fact, a traditional public forum?; and (3) is the University's grounds use policy unconstitutional? The court addresses each issue, in turn.

### A.    Keister Has Standing to Pursue His Claims

At the outset, the court is required to examine whether Keister has Article III standing to bring his claims. *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009) (citing *Elend v. Basham*, 741 F.3d 1199, 1204 (11th Cir. 2006)). Defendants argue that Keister lacks standing to bring a claim for actual damages because he has not suffered an actual injury. (Doc. # 59 at 12-14). Further, Defendants claim that Keister lacks standing to challenge the reasonableness and view-point neutrality of the University's grounds use policy because Keister's

proposed remedy would not redress any such alleged harm. (*Id.* at 14-17). The court disagrees.

As a threshold matter, Article III standing has three elements:

(1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Fla. Family*, 561 F.3d at 1253 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1991)) (internal citations and quotation marks omitted). The burden is on Keister, as the party seeking to invoke this court's jurisdiction, to produce facts sufficient to support Article III standing. *Id.* (citing *Pittman v. Cole*, 267 F.3d 1269, 1282 (11th Cir. 2001)).

Defendants' primary argument is that Keister left the intersection at issue due to the weather, not for fear of arrest. Specifically, Defendants argue that Keister did not encounter the University police officer until after he packed up and left the intersection, due to the weather. (Doc. # 59 at 18). And when Keister did encounter the officer, he was "only told that he would be trespass[ing] if he returned." (*Id.*) (emphasis omitted). According to Defendants "[g]iven that the undisputed evidence demonstrates that [ ] Keister never suffered any 'past injury,' he lacks standing to bring his claim for actual/nominal damages." (*Id.*). Defendants are incorrect. Although the parties dispute the reason Keister and his friend packed up their materials, it is undisputed that they encountered the officer before they left the intersection and were threatened with arrest if they returned without a permit. (Doc. # 59-4 at 42).

Keister suffered an injury-in-fact related to his ability to speak at the intersection of University Boulevard and Hackberry Lane that is both concrete and imminent. When considering a similar standing argument in the analogous case of *Bloedorn v. Grube*, the Eleventh Circuit

11

observed that "[i]n determining whether an injury is imminent, the law 'requires only that the anticipated injury occur within some fixed period of time in the future. Immediacy, in this context, means reasonably fixed and specific in time and not too far off.'" 631 F.3d 1218, 1228 (11th Cir. 2011) (citing *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.,* 557 F.3d 1177, 1193-94 (11th Cir. 2009)) (internal quotation marks, alterations, and citation omitted); *see also Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir. 2001) ( "[T]he injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced.") (internal quotation marks omitted). "Moreover, a plaintiff need not expose himself to enforcement of a law to challenge it in the First Amendment context; instead, 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" *Bloedorn*, 631 F.3d at 1228 (citing *Pittman,* 267 F.3d at 1283). But, to establish standing, "the plaintiff must show that he has an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute or rule, *and* that there is a credible threat of prosecution." *Id.* (emphasis added).

Here, Keister is an outside, unsponsored speaker who attempted to speak at multiple University locations, but was turned away from the campus because he refused to comply with the University's grounds use policy. He was told that if he returned to campus and attempted to share his message without a grounds use permit,  he would be arrested for trespassing.  Keister has repeatedly stated that he fervently wishes to return and share his message with UA students, but he has not been able to do so for fear of arrest. The Rule 56 record leads this court to believe that

University police officers would arrest Keister if he returned to campus to speak at the intersection of University Boulevard and Hackberry Lane (or, anywhere on campus) without a grounds use permit. This is enough to establish an injury in fact that is actual, concrete, and particularized. *See Bloedorn*, 631 F.3d at 1228

Second, there is a "causal connection" between Keister's injuries and the University's grounds use policy.  Keister has stated multiple times that *but for* the policy, he would return to UA and share his message with the college-aged students and others. The only hurdle to Keister returning to UA is the grounds use policy. That is, the Rule 56 evidence clearly permits the inference that nothing else is keeping Keister away. (*Id.*).

Finally, the court has little doubt that each of Keister's complained of injuries could be addressed by a favorable decision in this case. *Id.* (citing *Fla. Family*, 561 F.3d at 1253). In sum, the court easily concludes that Keister has standing to pursue his claims.

### B.    Forum Analysis

As an initial matter, the court reminds the parties that under "law-of-the-case doctrine" *Kesiter*, as a published Eleventh Circuit decision, is binding on its court. *See Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (11th Cir. 2000) ("Under the law of the case doctrine, both the district court and the appellate court are generally bound by a prior appellate decision of the same case." ). This means the Eleventh Circuit's conclusion that the intersection of University Boulevard and Hackberry Lane is a limited public forum, *Keister*, 879 F.3d at 1289-91, is at least presumptively binding on this court (subject, of course, to it becoming clear the Rule 56 facts are different from those in the record at the time the circuit reviewed this court's Rule 65 denial).

As the court noted in its opinion denying Defendants' 12(b)(6) Motion:

If discovery shows that the relevant facts on which the Eleventh Circuit's decision was based were, in fact, not the real facts, then Plaintiff will of course be free to

13

> argue that the intersection is not a limited public forum. Even under the law-of-the-case doctrine, a prior judicial decision is not binding if, since the prior decision "new and substantially different evidence is produced." *This That And The Other Gift And Tobacco, Inc*. v. Cobb County, 439 F.3d 1275, 1283 (11th Cir. 2006) (internal quotation marks omitted). Thus, while the facts on which the Eleventh Circuit's decision was based do not appear to be subject to reasonable dispute, that does not prohibit Plaintiff from trying to show otherwise.

(Doc. # 49 at 5).  Keister has tried mightily to discover and present new evidence showing the intersection at issue is a traditional public forum. (Doc. # 60-8 at 14-15). Defendants presented additional evidence refuting that claim. (Docs. # 63, 63-1, 63-2). In light of this, the court's next step is to conduct a forum analysis and consider all of the Rule 56 record evidence. (Doc # 49-5); *This That And The Other Gift*, 439 F.3d at 1283.

### i.   The Intersection at University Boulevard and Hackberry Lane is a Limited Public Forum

The court begins its analysis by reciting the unremarkable principle that the First Amendment does not guarantee access to property just because it is owned by the government. *Bloedorn*, 631 F.3d at 1230 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 803 (1985). Rather, the courts perform a "forum analysis" to evaluate restrictions on private speech and expression that occur on government property. *Keister*, 879 F.3d at 1288.  The Supreme Court has recognized four different categories of government fora: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum. *Id.* (citing *Barrett v. Walker Cty. Sch. Dist*., 872 F.3d 1209, 1223 (11th Cir. 2017)) The parties agree there are only two fora at issue here: (1) the traditional public forum, and (2) the limited public forum. *Keister*, 879 F.3d at 1288.

A traditional public forum is property that "ha[s] immemorially been held in trust for the use of the public[.]" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. Comm. for Indus. Org*., 307 U.S. 496, 515 (1939)).  The Supreme Court has

restricted traditional public forum status to its "historic confines." *Walke*r, 872 F.3d at 1223 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998)). These "historic confines" include public areas such as public streets and parks that, since "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry,* 460 U.S. at 45. "[A] time, place, and manner restriction can be placed on a traditional public forum *only* if it is content neutral, narrowly tailored to achieve a significant government interest, and "leave[s] open ample alternative channels of communication." *Bloedorn,* 631 F.3d at 1231 (citing *Perry,* 460 U.S. at 45) (emphasis in original).

By comparison, a limited public forum "is established when governmental entities open their property but limit its use to 'certain groups or dedicate[ ] [it] solely to the discussion of certain subjects.'" *Bloedorn*, 631 F.3d at 1231 If a space is classified as a limited public forum, the government may exclude a speaker "if he is not a member of the class of speakers for whose especial benefit the forum was created." *Cornelius*, 473 U.S. at 806 (citing *Perry*, 460 U.S. at 49). "Indeed, implicit in the idea that a government forum has not been opened widely and intentionally to the general public is the government's right to draw distinctions in access based on a speaker's identity." *Bloedorn*, 631 F.3d at 1235 (citing *Perry*, 460 U.S. at 49). Restrictions in a limited public forum only need to be "reasonable and viewpoint neutral." *Id*. at 1231.

The Eleventh Circuit has made it clear that "[t]he physical characteristics of the property alone cannot dictate forum analysis." *Bloedorn*, 631 F.3d at 1233. "Instead, we look to the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics." *Id.* "[T]he scope of the relevant forum is defined by 'the access sought by the speaker.'" *Id*. at 1232 (quoting *Cornelius*, 473 U.S. at 801). Just as at the preliminary injunction stage, Keister solely seeks to speak at the intersection. As such, that is

15

the scope of our forum assessment today. *Keister*, 879 F.3d at 1289.

Keister contends that the intersection's sidewalks are a tradition public forum. Specifically, he argues: (1) the Rule 56 record confirms that those sidewalks are city-owned, and thus, traditional public fora as a matter of law; and (2) the objective function and appearance of the sidewalks confirm traditional public forum status. (Doc. # 60-8 at 18).

In support of his first argument, Keister states that although he initially believed the City held an easement on the sidewalk, that is not so. According to Keister, "this court and the appellate court, based on the record at the time of the motion for preliminary injunction, deduced that these sidewalks are limited public fora on the belief that they sat on university property internal to— indeed in the 'heart of—UA.'" (Doc. # 60-8 at 16). But, Keister now maintains the sidewalks are property wholly owned and controlled by the City of Tuscaloosa, and are on the periphery of the campus, not in the "heart" of it.[6] (*Id.*). As such, Keister maintains the Eleventh Circuit's "erroneous presumptions" no longer hold true and the pathways "must" be deemed traditional public fora. (*Id.*). The issue of city ownership, Keister argues, "settle[s] the matter."[7] (*Id.* at 19, n.1).

In opposition, Defendants disagree with Keister's assertions about ownership of the sidewalks. Alternatively, they maintain that even if it could be shown that the City of Tuscaloosa

---

[6] The undisputed Rule 56 evidence is to the contrary. It is clear the intersection is located in the heart of campus. *See supra*, p. 4, Campus Map; *see also Keister*, 879 F.3d at 1291.

[7] To bolster his arguments, Keister has attached the following exhibits to his brief:

- Photographs of the intersection of University Boulevard and Hackberry lane.

- Multiple maps depicting the demarcation of the University and the City of Tuscaloosa.

- Multiple photographs featuring the University, and other landmarks.

- Municipal right-of-way use license agreement between the City of Tuscaloosa and the University.

(Docs. # 60-1 to 60-8).

owns the sidewalks, ownership is not dispositive in a forum analysis, and the objective function and appearance of the sidewalks indicate they still constitute a limited public forum. (Doc. # 63 at 12).

The Eleventh Circuit has previously provided controlling guidance on how to determine the type of forum on a public college campus. For example, on the prior appeal in this case, the Eleventh Circuit noted that in the factually similar case of *Bloedorn*:

> The plaintiff wished to preach on Georgia Southern University's ("GSU") campus and, when denied, filed suit asserting that GSU's speech policy violated the First Amendment. This Court held that GSU's sidewalks, pedestrian mall, and rotunda were limited public fora because (1) a state-funded university is not *per se* a traditional public forum; and (2) there was no evidence GSU intended to open those areas for public expressive conduct. By limiting who may use its facilities to a discrete group of people—the GSU community—we concluded "[t]his is precisely the definition of a limited public forum."
>
> We also held that it is of lesser significance that the GSU sidewalks and Pedestrian Mall physically resemble municipal sidewalks and public parks. The physical characteristics of the property alone cannot dictate forum analysis. Noting that although GSU's campus possessed many features similar to public parks—such as sidewalks, pedestrian malls, and streets—we held its essential function was quite different: education. Thus, because GSU did not intend to open its sidewalks to public discourse, it was a limited public forum.

*Keister*, 879 F.3d at 1290 (11th Cir. 2018) (internal citations omitted). Importantly, in coming to its conclusion in *Bloedorn*, the Eleventh Circuit stated "the purpose of a university is strikingly different from that of a public park. Its essential function is not to provide a forum for general public expression and assembly; rather, the university campus is an *enclave* created for the pursuit of higher learning[.]" *Bloedorn*, 631 F.3d at 1332-34 (emphasis added).

Keister's main argument is that the intersection sidewalks are owned by the City of Tuscaloosa, and not the University. Keister likens this case to other cases in which courts have held that city-owned sidewalks are traditional public fora. (Doc. # 60-8 at 20-21) (citing *Int'l*

*Caucus of Labor Comm. v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997) (recognizing "city sidewalks" as traditional public fora); *Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *McCullen v. Coakley*, 573 U.S. 464, 474-75 (2014); *Tucker v. City of Fairfield*, 398 F.3d 457, 463 (6th Cir. 2005)). But Keister's "new" argument is merely a re-packaged version of his prior arguments. In his Motion for Preliminary Injunction, Keister argued that because the intersection is open as a public thoroughfare, it is a *per se* public forum. (Doc. # 6-12 at 10). This argument has already been addressed by this court and was squarely rejected by the Eleventh Circuit. *Keister*, 879 F.3d at 1291.

Further, the court need not decide whether the documents submitted by Keister (namely, the Municipal Land Permit) prove that the intersection sidewalks are owned by the City of Tuscaloosa. Even if the City of Tuscaloosa does own the sidewalks at issue, that does not change in any way the court's analysis. Regardless, the sidewalks are owned by a government and (as Keister has acknowledged in previous briefing) "forum depiction does not turn on ownership." (Doc. # 10 at 12) (internal citations omitted); *see Greer v. Spock*, 434 U.S. 828 (1976) (noting that the government permitting citizens to access its land via sidewalks and streets does not automatically convert a nonpublic forum to a public one); *Bloedorn*, 631 F.3d at 1233 ("Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will.") (quoting *Grace*, 461 U.S. at 177). Because city ownership does not, as Keister maintains, "settle[] the matter," the court proceeds to conduct a forum analysis by examining the physical characteristics and visual surroundings of the intersection sidewalks to determine if they constitute an "enclave" distinguishable from the city streets and sidewalks outside of the campus' reach. *See Bloedorn*, 631 F.3d at 1233-34

Here, the objective characteristics and traditional uses of the sidewalks confirm the intersection's status as a limited public forum. As the Eleventh Circuit previously found:

> [T]here are objective indications that University Boulevard and Hackberry Lane are within UA's campus as opposed to "mere" public Tuscaloosa streets at that intersection. Unlike in *Grace*, where the Supreme Court held that its perimeter sidewalks were traditional public fora because they were not distinguishable from the Washington, D.C. public sidewalks, here the intersection, as evident from the UA map, is in the heart of campus. It is surrounded by UA buildings, and there are numerous permanent, visual indications that the sidewalks are on UA property including landscaping fences and UA signage. While physical characteristics are not dispositive for forum analysis, they independently support a limited public forum in this case as they suggest to the intended speaker that he has entered a special enclave.

*Keister*, 879 F.3d at 1290-91 (internal citations and quotations omitted). None of these facts have changed nor are they genuinely disputed. Specifically, on this Rule 56 record, the following physical characteristics support a finding that the intersection sidewalks are limited public forum: street signs bear the script "A" logo of the University; the intersection is embellished by University markings; the intersection is surrounded by prominent university buildings and marked faculty only parking lots; the landscaping fences that run through campus are on each corner of the intersection.

The undisputed Rule 56 record evidence support this conclusion. *Id*. at 1335 (citing *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129-30 (1981) ("[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.") (internal quotation marks omitted)). The Eleventh Circuit's decision in *Bloedorn* confirms this court's determination that the intersection sidewalks are a limited public forum. Just as in *Bloedorn*, the University's essential function is not to provide a forum for public expression. 631 F.3d at 1334.  Rather, the campus functions as an enclave "created for the pursuit of higher learning by its admitted and registered students and by its faculty."

19

Further reinforcing this determination, "virtually every recent case involving a First Amendment speech challenge to a university policy regulation, or action has been analyzed under the 'limited public forum' framework." *Young America's Foundation v. Kaler*, 370 F. Supp. 3d 967 (D. Minn. 2019) (concluding that the University of Minnesota's large-scale events policy created a limited public forum); *see e.g.*, *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679-84 (2010 ("[T]his case fits comfortably within the limited-public-forum category, for [the Christian Legal Society], in seeking what is effectively a state subsidy, faces only indirect pressure to modify its membership policies; CLS may exclude any person for any reason if it forgoes the benefits of official recognition."); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-30 (1995) (concluding the limited public forum framework appropriate for analyzing payments from the University of Virginia to its Student Activities Fund ("SAF") to outside contractors for the printing costs of a variety of publications issued by student groups); *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017) (affirming on re-hearing the district court's conclusion that Iowa State University created a limited public forum for First Amendment purposes); *Bloedorn*, 631 F.3d at 1232-33 (affirming that district court's conclusion that the sidewalks, pedestrian mall, and rotunda at Georgia State University falls into the category of a limited public forum); *Young Am.'s Found. v. Napolitano*, No. 17-CV-02255-MMC, 2018 WL 1947766, at *3 (N.D. Cal. Apr. 25, 2018) (concluding the forum at issue at the University of California, Berkeley was a limited-public forum); *Kushner v. Buhta*, No. 16-CV-2646 (SRN/SER), 2018 WL 1866033, at *10 (D. Minn. Apr. 18, 2018), *aff'd*, 771 F. App'x 714 (8th Cir. 2019) (affirming the district court's conclusion that the parties' stipulation that a lecture hall at the University of Minnesota Law School was a limited public forum was appropriate); *Bus. Leaders in Christ v. Univ. of Iowa*, No. 317CV00080SMRSBJ, 2018 WL

4701879, at *7 (S.D. Iowa Jan. 23, 2018)  (concluding that "[a] [U]niversity [of Iowa] program that grants student organizations official registration or recognition amounts to a limited public forum."); *Students for Life USA v. Waldrop*, 162 F. Supp. 3d 1216, 1233 (S.D. Ala. 2016) (concluding  that the perimeter of campus at the University of South Alabama is "at best a limited public forum.").

Because the undisputed Rule 56 record evidence shows that the intersection is within the University's campus, is not intended as an area for the public's expressive conduct, and contains markings sufficiently identifying it as an enclave, the intersection sidewalks are a limited public forum.

### C.      The University's Permitting Restrictions are Constitutional

Having determined that the intersection is a limited public forum, the court turns to Keister's challenges to the University's grounds use policy. Keister maintains that the grounds use policy: (1) is unconstitutionally vague; (2) is content based; (3) vests University officials with unbridled discretion for licensing speech; (4) is not narrowly tailored;[8] (5) does not leave open ample alternatives for speech; and (5) that a ten working day advance notice requirement is unconstitutional.

In analyzing the constitutionality of the grounds use policy, the court is cognizant of the Supreme Court's guidance on this topic:

> Our inquiry is shaped by the educational context in which it arises: First Amendment rights, we have observed, must be analyzed in light of the special characteristics of the school environment. This Court is the final arbiter of the question whether a public university has exceeded constitutional constraints, and

---

[8]  Because the court has concluded that the intersection sidewalks are a limited public forum, the University's policy is not required to be "narrowly tailored." *Bloedorn*, 631 F.3d at 1231 (Restrictions in a limited public forum only need to be "reasonable and viewpoint neutral." ). Thus, the court need not address this argument. Having said that, the court notes that while considering a similar policy in *Bloedorn*, the Eleventh Circuit found that the restrictions imposed were in fact narrowly tailored. 631 F.3d at 1228-1242.

we owe no deference to universities when we consider that question. Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review.

*Christian Legal Soc'y*, 561 U.S. at 685-86 (internal citations, alterations, and quotation marks omitted). Because the intersection sidewalks are a limited public forum "any time, place, and manner restrictions made on expressive activity need only be viewpoint neutral and reasonable; and the restriction need not 'be the most reasonable or the only reasonable limitation.'" *Bloedorn*, 631 F.3d at 1235 (quoting *Cornelius,* 473 U.S. at 808). "The regulation is constitutional so long as it is 'reasonable in light of the purpose which the forum at issue serves.'" *Id*. (quoting *Perry Educ. Ass'n,* 460 U.S. at 49).

### i.     The Ground Use Policy is Not Unconstitutionally Vague

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). According to the Supreme Court, vague laws offend several important values:

First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.

*Id*. at 108-09 (internal quotations omitted).

Keister maintains that the University's grounds use policy exception for "casual recreational or social activities" is vague, enables censorship, and is unconstitutional in any fora.

(Doc. # 60-8 at 25). Keister argues that the phrase is unconstitutionally vague because the policy "does not define th[ese] terms and neither are they self-explanatory" and "sans definition, [this] vague language empowers UA officials to divide for themselves what is 'casual' (with no standards to go on) and shut down for lack of permit." (Doc. # 60-8 at 25-26).  According to Keister, "[t]his gives UA officials opportunity to censor controversial topics or disagreeable viewpoints by simply concluding the speech is not 'casual,' while leaving others who lack a permit but have more favorable viewpoints alone." (*Id.* at 26).

When viewing the totality of the grounds use policy, the phrase "casual recreational or social activities" is not unconstitutionally vague.  In full, the grounds use policy states "[o]ther than uses for casual recreational or social activities, reservations must be made for the use of buildings and grounds under the control of the University, including University sidewalks (an 'Event')." (Doc. # 59-2 at 10). Although, the language of the policy is not precise, "we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Where, as here, the language of the grounds use policy is "marked by 'flexibility and reasonable breadth, rather than meticulous specificity,'" it is clear what the ordinance as a whole prohibits.[9] *Id.* (quoting *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1088 (8th Cir. 1969) (Blackmun, J.), *cert. denied*, 398 U.S. 965 (1970)).   Specifically, the policy makes it clear that individuals (affiliated or not) who wish to engage in a casual picnic on University grounds need not obtain a permit. But, non-affiliated individuals who wish to speak in "short bursts to draw attention," with voice amplification systems, or desire to share their "message" by approaching students and faculty on University grounds (including sidewalks) to hand out literature, must obtain a permit.

---

[9] As the Supreme Court has noted, "[i]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned*, 408 U.S. at 110 n.15 (quoting *American Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950)).

The Rule 56 record evidence shows that the grounds use policy furthers the University's purpose of preserving the primacy of its teaching and research missions, as well as facilitating the responsible stewardship of University resources. (Doc. # 59-2 at 9). Requiring the University to list all activities that qualify as "casual recreational or social activities" would be tedious, unnecessary, and largely unhelpful. The University's current policy gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and does not impermissibly delegate basic policy matters to University officials for resolution on an *ad hoc* and subjective basis. *See Grayned*, 408 U.S. at 108-09. Thus, the court concludes that the grounds use policy is not unconstitutionally vague.

### ii. The Grounds Use Policy is Content Neutral and Does Not Vest University Officials with Unbridled Discretion for Licensing Speech.

To begin, Keister simply has not established that the grounds use policy discriminates based on content.[10] Nor has he established that the permitting scheme affords University officials unbridled discretion for licensing speech (*i.e.*, assigning the location, date time, and length of the grounds use permits). Facially, the grounds use policy is content neutral. It does not discriminate based on the speaker or the message the speaker wishes to convey. All non-affiliated outside

---

[10] Keister also maintains that the exception to the grounds use policy for casual recreational or social activities" is content based. (Doc. # 60-8 at 25). Keister states that if he "and another individual discuss sports as they traverse the sidewalks, their expression is likely deemed exempt as 'recreational' speech, but if the conversation turns to the merits of Keister's religious beliefs, then it is no longer 'casual recreational or social,' but an 'event' requiring a permit." (*Id.* at 25-26). Thus, Keister maintains, the permit scheme is "unavoidably and impermissibly content-based." (*Id.* at 26). Keister is grasping at straws with this argument.

Discussing sports or religion while strolling through campus with a friend is not prohibited by the grounds use policy. In fact, this type of activity exemplifies a "casual recreational or social event." Prohibiting non-affiliated individuals from using University grounds without a permit is in line with the purpose and mission of the University. The space and facilities on University grounds are primarily intended for the teaching, research, and service components of the University's mission. And, the grounds use policy is intended to "facilitate the responsible stewardship of institutional resources." Activities outside the teaching, research, and service components of the University "must not interfere with the academic climate of the University." Speaking in "short bursts to draw attention," handing out literature, or using voice amplification, certainly has the potential to detract from the academic climate of the University.

speakers (regardless of the message they wish to promote) must follow the grounds use policy and obtain a permit if they wish to speak on University grounds.

Keister also maintains the grounds use policy sponsorship requirement vests unbridled discretion with University officials to license speech. (Doc. # 60-8 at 26). According to Keister, "[m]andating the need for a sponsor, UA supplies no criteria on whether sponsorship should be granted, leaving it entirely to the whims of each UA entity to decide whether to sponsor the speech or not."[11] (Doc. # 60-8 at 26). The Rule 56 evidence does not support that argument. Rather, it shows that a grounds use permit is only denied for one of the seven enumerated reasons in the policy handbook. (Doc. # 59-2 at 14).

Moreover, Keister's arguments are foreclosed for the reasons noted in the court's initial opinion denying Keister's Motion for a Preliminary Injunction and the Rule 56 evidence. To reiterate, this court stated:

> [Keister] maintained at oral argument that the sponsorship requirement embedded in UA's speech policy may ultimately lead to speakers being denied access to UA's campus based on their viewpoint. Speakers are only entitled access to the campus under UA's Policy if they are sponsored by a student group. Because there is a potential that student groups may deny him (or any other speaker) sponsorship based on his viewpoint, [Keister] contends that UA's Policy itself is not viewpoint-neutral. The court disagrees and finds guidance from *Bloedorn* on this issue. There, regarding GSU's sidewalks, the court noted "[t]he University has limited these areas only for use by a discrete group of people – the GSU community; its students, faculty, and employees; and their sponsored guests." *Bloedorn*, 631 F.3d at 1232. Having found that Bloedorn was not "a member of the class of speakers for whose especial benefit the forum was created," the court reasoned that "he may be constitutionally restricted from undertaking expressive conduct on the University's sidewalks," and that such restriction (based on his lack of sponsorship) was not viewpoint-based. *Id.* at 1235. The court finds the same to be true here. UA's Policy applies equally to all sponsored speakers (who are allowed to speak so long as they meet the criteria outlined in the policy) and to all non-sponsored speakers (who are not allowed to speak, regardless of viewpoint). The key is that UA is not making any decisions based on a speaker's viewpoint. *See Gilles v. Miller*, 501 F.

---

[11] For example, the University notes that Milo Yiannopoulos was allowed to speak on campus, despite counter-protests of several student organizations, because he was sponsored by the University of Alabama College Republicans (a registered student organization). (Doc. # 59-2 at ¶ 47).

> Supp. 2d 939, 948 (W.D. Ky. 2007) (finding that a university's sponsorship policy did not result in viewpoint discrimination where the university did not bar the plaintiff from obtaining a sponsorship from a student organization and did not forbid student groups with views similar to the plaintiff's).

(Doc. # 22 at 14-15, n.12) (emphasis in original). Keister has not presented any Rule 56 record evidence showing (or even suggesting) that the University is the actual decision maker. Rather, the undisputed evidence in the Rule 56 record shows that the University will go above and beyond to assist non-affiliated speakers and groups connect with student organizations in order to meet the sponsorship requirement.[12]

### iii.       The Grounds Use Policy Leaves Open Ample Alternatives for Expression

Keister next argues that "UA's policy prevents him from speaking in any manner on city-owned sidewalks near campus, depriving him of his intended audience." (Doc. # 60-8 at 29). Keister cites *Amnesty International, USA v. Battle*, 559 F.3d 1170, 1183-84 (11th Cir. 2009) for the proposition that restrictions that prevent speakers from reaching their audience fail to leave ample alternatives. However, in *Amnesty International*, a group of protestors were wholly excluded from a rally and prevented from communicating their message to anyone via any form of expression (including leafletting and protesting outside the rally). 559 F.3d at 1183-84. The Eleventh Circuit likened the complete exclusion of protestors to giving the group "a permit to hold a meeting in an auditorium and then barr[ing] the doors and windows such that no audience could enter and no sound could escape the building." *Id*. The court concluded that "[s]uch action clearly fails to leave open ample alternative channels for communication." *Id.* (internal quotation marks

---

[12] For example, when the unaffiliated religious organization "the Gideons" wanted to share their messages on campus, they completed the grounds use permit process and worked with Donna McCrary, Senior Director of Facilities and Operation and Ground Use Permits,  to obtain a sponsor. (Doc. # 59-2 at 3, ¶¶ 28, 29). The Gideons have worked with the University to obtain grounds use permits for the past several years. (Doc. # 59-2 at 3, ¶¶ 28, 29). In fact, in 2016 alone, the Gideons were granted twelve approved ground use permits.  (*Id*.).

omitted).

Unlike in *Amnesty International*, the University's grounds use policy leaves open ample alternatives for communication. Plainly, Keister does not like the alternatives. But, he is not barred from speaking on campus; he merely has refused to apply for a grounds use permit because he contends he is "authorized by God to speak whenever [God] tells [him] to and when [God] tells [him] to." (Doc. # 59-4 at 46).  In fact, Keister has not been excluded from the campus at all. The University has worked with other outside organizations, including the Gideons, to obtain student organization sponsorship and a grounds use permit. Keister is also able to speak with students outside University grounds, within the city limits of Tuscaloosa. In *Bloedorn,* the Eleventh Circuit held that a similar policy left open ample alternative channels for communication when plaintiff could "avoid the limitations imposed by the permitting scheme simply by speaking to students as they enter and exit the campus from GSU's several well-marked entrance and exit points" and "conceivably obtain sponsorship from one of the countless GSU-affiliated organizations to speak on campus." 631 F.3d at 1242. Although Keister may not like the alternative channels for communication, they do exist.

### iv.    The Advance Notice Requirement is Constitutional

Finally, Keister argues that regardless of forum classification, a 10-working-day advance notice requirement is unconstitutional. When reviewing this court's denial of  preliminary injunction, the Eleventh Circuit noted "this Court does have some concerns about whether UA's 10 working day advance notice requirement would be reasonable for events that do not require multiple department approvals[.]" *Keister*, 879 F.3d at 1288 n.4. But -- and this point may have escaped the attention of the panel on interim review -- the grounds use policy does not *require* a ten-day notice for smaller events. Rather, the grounds use policy states, in relevant part,

> To facilitate the review by all the different University department that have responsibility for the various aspects of an Event (e.g., tents food service, UAPD, electrical service, etc.), applicants for use of the Grounds *should* request permission for such use ten (10) working days prior to the Event.

> If an Event does not involve factors that require multiple University department approvals, approval may be given in as few as *three days*.

(Doc. # 59-4 at 12) (emphasis added).[13] So, for smaller events, like Keister sharing his message, approval may be given in as little as three days.[14] Although the University does retain discretion to take longer than three days with the use of the permissive "may," the court does not presume to second guess the University's internal approval process. *Christian Legal Soc'y*, 561 U.S. at 685-86 ("Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review.") (internal citations, alterations, and quotation marks omitted).

Obviously, the requirement for some notice serves a legitimate purpose, particularly on a college or university campus. "Universities are less equipped than other public forums to respond to disruptions on short notice, and implementing a relatively short 'wait period' for the University to review a grounds use permit form is certainly reasonable." (Doc. # 22 at 13-14) (citing *Sonnier v. Crain*, 613 F.3d 436, 445 (5th Cir. 2010), *opinion withdrawn in part on reh'g*, 634 F.3d 778 (5th Cir. 2011) (holding that a public university's speech policy was narrowly tailored when it employed a seven-day notice requirement).[15] And, to be clear, in the instance of a limited public

---

[13] The University also provides an expedited permit approval process for "counter-events" or spontaneous events. (Doc. # 59-4 at 12). Under the expedited review process, the University will attempt to provide a permit "within twenty-four (24) hours, to an area of the Grounds which is available and which does not interfere with regular academic programs or schedule[d] events and programs." (*Id*.).

[14] The average approval time for a grounds use permit is 4.4 days. (Doc. # 59-7).

[15] The Fifth Circuit withdrew its *Sonnier* opinion, in part. 634 F.3d 778. But, the portion of the opinion cited by this court was not contained in the part that was withdrawn..

forum, reasonableness is all that is required.

## IV.    Conclusion

The court appreciates Plaintiff's commitment to sharing the gospel and his efforts to do so. However, his claims in this case are without merit. For the reasons discussed above, the court concludes that Plaintiff's Motion for Summary Judgment (Doc. # 60) is due to be denied, and Defendants' Motion for Summary Judgment (Doc. # 59) is due to be granted. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this May 19, 2020.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE